# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

ANNE GLENN WELTNER,
FRANCYS JOHNSON, and LAURA
REGISTER,

           **Plaintiffs,**

v.

BRAD RAFFENSPERGER,
SECRETARY OF STATE, STATE
OF GEORGIA,

        **Defendant.**

**Civil Action No. 1:20-cv-01407-ODE**

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Anne Glenn Weltner, Francys Johnson, and Laura Register file this Brief in Support of their Motion for Preliminary Injunction.

## I.    INTRODUCTION

This action seeks the immediate return to Georgia voters what Defendant Secretary of State Raffensperger has taken from them: the right to vote for justice of the Georgia Supreme Court.   This case is brought under Section 1983, the purpose of which is "to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from

1

unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" *Mitchum v. Foster,* 407 U.S. 225, 242 (1972).   In this case, the right to be protected is the franchise of voting, a "fundamental right, because preservative of all rights." *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886).

As explained in greater detail below, in plain violation of state and federal law, the Secretary scheduled, and then cancelled, the non-partisan general election for Justice Keith R. Blackwell's position on the Supreme Court of Georgia.  The purported basis for the cancellation of this election – the "color of state law" - was Justice Blackwell's February 26, 2020 announcement that he intended to resign effective November 18, 2020.  Under Georgia law, an election may be avoided if three conditions are met: (a) there is a vacancy; (b) the Governor appoints a justice to fill the vacancy; and (c) the appointed justice assumes the seat on the Supreme Court.  Not one of those conditions has been met in this case: there is no vacancy because Justice Blackwell is still on the bench; there has been no appointment to fill the non-existent vacancy; there is no appointed justice to assume any seat on the Supreme Court.

The Secretary's lawless cancellation of the election violates Federal law under either of two alternative theories.  First, because the Secretary's action violates State law, under the Former Fifth Circuit's decision in *Duncan v.*

2

*Poythress,* 657 F.2d 691, 704 (1981), it violates Due Process: "It is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law so that they may fill the seats of government through the power of appointment."  The *Poythress* case, discussed in greater detail below, is unusually on point and controlling.  Second, if Georgia law somehow permits this kind of gamesmanship to deprive voters of the right to vote, Georgia law violates the Due Process Clause of the Fourteenth Amendment because there is no legitimate, much less compelling, justification for the deprivation.  *Burdick v. Takushi,* 504 U.S. 428, 438  (1992).

There are no technical, jurisidictional or equitable impediments to granting immediate injunctive relief: Plaintiffs have standing, no immunities apply, there is no basis for abstention, there are no material facts in dispute, the law is crystal clear, and an order directing the Secretary to take all necessary action to conduct this election on the date of the general primary, currently set for June 9, 2020, manifestly is in the public interest.

## II.    LEGAL AND FACTUAL CONTEXT

The Constitution of the State of Georgia provides that "All Justices of the Supreme Court and the Judges of the Court of Appeals shall be elected on a nonpartisan bases for a term of six years."  Ga. Const. Art. VI, Sec. VII, Par. I(a).

Justice Keith R. Blackwell currently serves as Associate Justice of the Supreme Court of Georgia.  His current term began on January 1, 2015 and ends on December 31, 2020.  (Doc. 1, ¶ 12; *see also* Exhibit 1 hereto, *passim*).  The non-partisan general election for Justice Blackwell's position on the Supreme Court of Georgia was scheduled by Secretary Raffensperger for May 19, 2020.  Plaintiffs are registered Georgia voters from Fulton, Bulloch and Grady Counties who intended to vote in the May 19, 2020 election for the Supreme Court of Georgia, (Doc. 1, ¶¶ 6-8), now rescheduled to June 9, 2020.

On February 26, 2020, Justice Blackwell sent a letter to Governor Brian Kemp stating that he would "conclude" his "judicial service at the end of the August Term of the Supreme Court, a date sufficiently distant to avoid – in light of the imminent retirement of Justice Robert Benham – the disruption in the important work of the Court."  (Exhibit A to Exhibt 1, attached).  Justice Blackwell stated: "Please accept my resignation from the Supreme Court, effective November 18, 2020."  (*Id.*).  Governor Kemp responded to Justice Blackwell's letter the same day, February 26, 2020.  Governor Kemp wrote: "Thank you for taking the time to apprise me of your resignation, effective November 18, 2020.  Your resignation as Justice of the Supreme Court of Georgia is hereby accepted, and I wish you all the best."  (Exhibit B to Exhibit 1, attached).

Defendant Raffensperger then cancelled the election for Justice Blackwell's seat, even though Justice Blackwell will remain on the bench until November 18, 2020.   There is no constitutional or statutory provision authorizing the Secretary of State to cancel an election.   O.C.G.A. § 21-2-9(b), which governs the timing of the election, states that, without exception, that "Justices of the Supreme Court . . . *shall* be elected in the nonpartisan election next preceding the expiration of the term of office."

Though it is nowhere expressly provided for in the Consitution or statutes of Georgia, the only arguable reason not to hold an election for a Supreme Court justice is if, prior to the time of the scheduled election, (a) there is a vacancy (b) that is filled by appointment of the Governor and (c) the appointed Justice assumes the office.  Article V, Section II, Paragraph VIII(a) gives the Governor the authority to fill a vacancy created by a resignation: "When any public office shall become vacant by death, resignation, or otherwise, the Governor shall promptly fill such vacancy."  This provision does not apply, however, because Justice Blackwell has not vacated his position and there is no vacancy for the Governor to fill.

Instead, Justice Blackwell remains an active justice on the Georgia Supreme Court.  Justice Blackwell has stipulated that he plans to continue all of his duties as a Supreme Court Justice until November 18, 2020, and to receive all of the benefits

5

of his employment, including retirement benefits, insurance, and salary, until November 18, 2020.  (Exhibit 1, ¶¶ 24, 25).

Another provision, Article VI, Section VII, Paragraph IV, provides that "[a]n appointee to an elective office shall serve until a successor is duly selected and qualified and until January 1 of the year following the next general election which is more than six months after such person's appointment."  Under this provision, had Justice Blackwell actually resigned and vacated his position on the Supreme Court (which Justice Blackwell did not do) and had Governor Kemp "promptly" appointed his successor (which Governor Kemp has not done), then Justice Blackwell's position would not be open for the general nonpartisan election on May 19, 2020 because the term of the Governor's appointee on the Supreme Court would last until January 1, 2023.

At least two candidates for the Georgia Supreme Court, John Barrow and Elizabeth Beskin, timely tendered applications, required notices, and the qualification fees for Justice Blackwell's seat.  At Secretary Raffensperger's direction, however, employees at the Secretary of State's office declined to accept the tendered documents and fees.  (Doc. 1, ¶ 19).

## III.   PRELIMINARY ISSUES

### A.   Plaintiffs Have Standing

Plaintiffs are Georgia voters who clearly have standing.  (Doc. 1, ¶¶ 6-8). Plaintiffs have sufferend and will continue to suffer the "concrete and particularized" injury of being unable to vote for justice of the Supreme Court, an injury that will be redressed by a decision in their favor.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992); *Common Cause/Georgia v. Billups,* 554 F.3d 1340, 1350 (11ᵗʰ Cir. 2009).

### B.   No Immunities Apply

This case challenges the federal constitutionality of a state official's action and accordingly is not a suit against the State for purposes of Eleventh Amendment immunity.  *Ex parte Young,* 209 U.S. 123 (1908);  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984) ("a suit challenging the constitutionality of a state official's action is not one against the State" for purposes of the Eleventh Amendment).   The Secretary regularly raises the Eleventh Amendment as a defense to election cases, but without any success.  "Undoubtedly, *Ex parte Young* suits are permitted when the plaintiff alleges that state election officials are conducting elections in a manner that does not comport with the Constitution." *Curling v. Raffensperger*, 761 F. App'x 927, 934 (11th Cir. 2019) (holding that

Secretary's argument that he has Eleventh Amendment immunity to voters'

Section 1983 suit runs counter to "any number of binding precedents").

## C.     Pendancy of State Court Action Does Not Warrant Stay or Abstention

Currently pending before the Georgia Supreme Court are cases brought by

potential candidates John Barrow and Elizabeth Beskin seeking reversal of the

Superior Court's refusal to grant a writ of mandamus that would have compelled

Secretary Raffensperger to hold the election for Justice Blackwell's seat.  Six

justices (including Justice Blackwell) have disqualified themselves, and five were

replaced by Georgia Superior Court judges.  Chief Justice Melton, Justice

Nahmias, and Justice Warren did not recuse themselves.  Though the appeal was

initially expedited, the Georgia Supreme Court issued an order on April 3rd stating

that it would not be issuing an immediate opinion:

> Having reviewed the expedited briefs of the parties, the Court has determined that it could provide adequate remedies to the appellants in the event they prevail (a matter as to which the Court expresses no opinion whatsoever at this time) even after absentee ballots are distributed for the May 19, 2020, nonpartisan general election. Accordingly, the Court will not issue an immediate opinion in these cases, although an opinion will be issued as soon as practicable.

(Ex. 2, *Barrow v. Raffensperger,* Ga. S. Ct., No. S20A1029 (Order, April 3,

2020)).

8

Defendant Raffensperger may argue that the Court should abstain from deciding this Motion, or stay the case, in light of the pending state proceedings under *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496 (1941). *Pullman* abstention does not apply to this case for multiple reasons.

### 1.    Absention *"particularly inappropriate" in Elections Cases*

A federal court has the discretion to abstain under *Pullman* if the case presents an unsettled question of state law and the question of state law is dispositive of the case or would materially alter the constitutional question presented.  *Id.; see also Harman v. Forssenius,* 380 U.S. 528, 534 (1965). However, "(a)bstention from the exercise of federal jurisdiction is the exception, not the rule."  *O'Hair v. White*, 675 F.2d 680, 692 (5th Cir. 1982).

 In exercising this discretion, a federal court must consider whether "certain classes of cases, and certain federal rights" are more appropriately "adjudicated in federal court."  *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 728 (1996).  The Eleventh Circuit has repeatedly held that voting rights cases are "particularly *inappropriate* for abstention," whether the right to vote concerns state elections or federal elections.  *See Siegel v. LePore,* 234 F.3d 1163, 1174 (11th Cir. 2000) (en banc) (emphasis added) (presidential election) ("Our cases have held that voting rights cases are particularly inappropriate for abstention.");  *Edwards v. Sammons,*

437 F.2d 1240, 1244 (5th Cir. 1971) (mayoral election) (reversing the District Court's decision to abstain under *Pullman,* holding that "the delay which follows from abstention is not to be countenanced in cases involving such a strong national interest as the right to vote").

Within the class of cases in which it is not appropriate to abstain – voting cases – this case stands out as unusually inappropriate.  This case is about the Georgia Supreme Court. The resolution of this case will have a direct impact on the makeup of the Court in 2021.  This is a case in which a majority of the members of the Georgia Supreme Court made the decision to disqualify themselves, presumably because their "impartiality might reasonably be questioned."

There is therefore no reason to depart from the law in this Circuit that *Pullman* absention is "particularly inappropriate" in election cases.  *League of Women Voters of Fla., Inc. v. Detzner*, 354 F. Supp. 3d 1280, 1283 (N.D. Fla. 2018) ("The law is crystal clear in the Eleventh Circuit. Federal courts do not abstain when voting rights are alleged to be violated.").

   2.   *Pullman Absention Does Not Apply in Any Event*

Even if this case did not involve the right to vote, *Pullman* absention would not apply because the decision of the Georgia Supreme Court will likely not

10

resolve the federal constitutional claims raised in this case.  Plaintiffs' case does

not depend upon the determination of whether Defendant Raffensperger violated

state law.  To the contrary: although Plaintiffs in Count One allege that Defendant

Raffensperger's cancellation of the election in violation of state law *ipso facto*

constitutes a violation of the federal constitution under *Duncan v. Poythress,*

*supra,* Count Two alleges, in the alternative, that "if Georgia law allows the

cancellation of the election under these circumstances, the resulting

disenfranchisement of Georgia voters plainly violates the United States

Constitution because it serves no legitimate purpose."    (Doc. 1, ¶ 3).

Crucially, the Georgia Supreme Court may not even squarely reach the

substantive state law question because of the nature of the state court claim  -

mandamus.  Under Georgia law, mandamus may be denied if the petitioner has not

shown "a clear legal right to the relief sought" *or* if the public official has not

"committed a gross abuse of discretion."  *Bibb Cty. v. Monroe Cty.,* 294 Ga. 730,

736 (2014).   The Georgia Supreme Court could avoid definiatively resolving the

state law question by holding that Defendant Raffensperger's legal duty was not

"clear" and that he did not abuse his discretion in cancelling the election.  Plaintiffs

do not for a moment concede any merit to such an argument: as explained in

greater detail below, Secretary Raffensperger's legal duty to hold the election is

clearly established in the Georgia Constitution.  But the fact remains that the Georgia Supreme Court may not render a definitive ruling on the merits of the state law claim.

## IV.   LEGAL STANDARDS

### A.   Granting of a Preliminary Injunction

Chief Justice Roberts summarized the familiar test for the granting of a preliminary injunction in *Winter v. NRDC,* 555 U.S. 7, 20 (2008):[1]

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

These are not rigid requirements to be applied by rote.  "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312 (1982).

---

[1] *See also Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1131 (11th Cir. 2005).

**B.     Procedure and Evidence**

Though discovery in this case has not formally opened and the Defendants have not answered the Complaint, this Motion is not premature.  "The grant of a temporary injunction need not await any procedural steps perfecting the pleadings or any other formality attendant upon a full-blown trial of this case."  *United States v. Lynd*, 301 F.2d 818, 823 (5th Cir. 1962) (Tuttle, J.).

In considering this Motion, the Court also is permitted to rely upon hearsay and upon affidavits in lieu of live testimony.  "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (at the "preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction").

**V.     ARGUMENT**

**A.     Plaintiffs Are Likely to Succeed on the Merits**

Plaintiffs are likely to succeed on either of their alternative claims for relief.

13

     1.     *By Cancelling an Election in Violation of State Law, Defendant has Violated Plaintiffs' Federal Consitutional Rights (Count One)*

The United States Constitution does not require that state justices be elected. Once the State decides that justices are to be elected, however, the U.S. Constitution prohibits state officials from disenfranchising voters in violation of state law. *Duncan v. Poythress,* 657 F.2d 691 (1981).

The *Duncan* case involved the retirement of Georgia Supreme Court Justice Jesse Bowles and Governor Busbee's appointment of his successor, Hardy Gregory.   Justice Bowles held a term of office on the Court which ended December 31, 1980.  On November 4, 1980, he was re-elected to the Georgia Supreme Court for a six-year term.  On November 30, 1980, however, he wrote a letter of resignation to Governor Busbee, stating that his resignation would be effective on the last day of his existing six-year term, December 31, 1980, and Governor Busbee accepted his resignation.  Under Georgia law, the effect of Justice Bowles' resignation after he had been elected for a new term, but before he took office, is to hold a special election to fill the position.  657 F. 2d at 705.

Secretary of State Poythress did not, however, hold a special election. Instead, on December 15, 1980, Justice Bowles, despite having already resigned, took the oath of office for the new term scheduled to begin on January 1, 1981.  On

14

January 5, 1981, his first day of office during the new term, Justice Bowles sent a second letter of resignation to Governor Busbee, which he accepted the same day. Three days later, Governor Busbee swore in Hardy Gregory, Jr. as the appointed replacement for Justice Bowles on the Georgia Supreme Court.

Voters filed suit under Section 1983 seeking to compel a special election for Justice Bowles' seat.  Judge Freeman granted the relief, and the Former Fifth Circuit affirmed, agreeing with the District Court that Justice Bowles' first resignation constituted a "withdrawal" from the office that he had just been elected to, triggering the special election statute.  The failure to hold a special election in contravention of state law, the Fifth Circuit held, constituted a violation of the U.S. Constitution:

> The district court stated that it 'can conceive of no more fundamental flaw in the electoral process than the deprivation of the right to vote altogether.' We likewise can imagine no claim more deserving of constitutional protection than the allegation that state officials have purposefully abrogated the right to vote, a right that is fundamental to our society and preservative to all individual rights. . . . It is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law so that they may fill the seats of government through the power of appointment.  We therefore hold that such action violates the due process clause of the fourteenth amendment.

657 F.2d at 704.

15

As in *Duncan,* the Secretary in this case has disenfranchised voters in violation of state law so that the seats of government could be filled through executive appointment.  The Georgia Constitution mandates that Justice of the Georgia Supreme Court "shall be elected on a nonpartisan bases for a term of six years."  Ga. Const. Art. VI, Sec. VII, Par. I(a).  The Georgia Constitution does, however, give the Governor the power of appointment if there is a vacancy: "When any public office shall become vacant by death, resignation, or otherwise, the Governor shall promptly fill such vacancy."  The question in this case, therefore, is whether Justice Blackwell's February letter stating that he was going to resign in November created a vacancy that the Governor could fill prior to the nonpartisan election for Justice Blackwell's successor.

The answer could not be more clear.  In cannot be disputed that Justice Blackwell's resignation did not create a vacancy:  Justice Blackwell is still on the Court; he did not vacate his seat; he will remain on the Court until November 18, 2020; there is no vacancy for the Governor to fill.   The Constitutional provision giving the Governor the power to appoint a Georgia Supreme Court justice is triggered by a vacancy: "When any public office shall become vacant by death, resignation, or otherwise, the Governor shall promptly fill such vacancy."  The

power of appointment is not triggered by a resignation, but by a *vacancy* created by death, resignation or otherwise.

This literal reading of the Constitution also is the only one that makes any sense.   The Governor can only fill a vacancy with an appointment when there is a vacancy.  Indeed, the Georgia Constitution states that when there is a vacancy, "the Governor shall promptly fill such vacancy," *id.*, making it even more clear that the words mean what they say: the Governor's appointment power is only triggered if there is a vacancy and, when there is a vacancy, he must "promptly" fill that vacancy.

Furthermore, even if Justice Blackwell had vacated his seat, Secretary Raffensperger would not be excused from holding an election for Justice Blackwell's position unless, prior to that election, the Governor had exercised his appointment power to appoint a Justice to fill that vacancy.  It is only when the appointee assumes his or her position on the Supreme Court that the appointee's new term overtakes the need for a nonpartisan election: "An appointee to an elective office shall serve until a successor is duly selected and qualified and until January 1 of the year following the next general election which is more than six months after such person's appointment."  Ga. Const. Art. VI, Sec.VII, Par. IV. Thus, had Justice Blackwell actually resigned, and had the Governor actually

appointed a successor, the appointee's term would last until January 1, 2023 – a term that would render an election for the seat this year unnecessary.  But neither of the two preconditions to cancelling an upcoming election – a vacancy and an appointment – has occurred.

In defense of his actions, Secretary Raffensperger will contend that Justice Blackwell's resignation, though expressly *not* effective until November 18, 2020, was actually effective when it was accepted by the Governor, on February 26, 2020.  This argument is completely meritless.  The Governor accepted a resignation that by its very terms was effective November 18, 2020; by accepting it nine months beforehand, the Governor did not change, and could not have changed, the express effective date of Justice Blackwell's resignation.

Moreover, the Secretary is not doing Justice Blackwell any favors by deeming his resignation "effective" in February.  If, as a matter of law, Justice Blackwell's resignation is effective in February 2020, then Justice Blackwell has no right to receive the compensation and employment benefits he is receiving until November 18, 2020.  This is absurd, of course: Justice Blackwell is still serving as justice and deserves to be paid.  But the State cannot have it both ways: it cannot keep Justice Blackwell on the bench and pay him, but treat him as retired for purpose of enabling Governor Kemp to appoint his successor.

The "effective date" issue, however, is a red herring.  The appointment power in the Georgia Constitution is not triggered on the "effective date" of the resignation; it is triggered when there is a vacancy created by resignation, death or otherwise.  Resignation will usually, and death will always, coincide with a vacancy; but the Georgia Constitution is very clear that the appointment power arises "[w]hen any public office shall become vacant" and at no other time.

Plaintiffs are therefore likely to succeed on Count One: by cancelling the election, Defendant Raffensperger disenfranchised Plaintiffs in violation of state law so that Justice Blackwell's position could be filled through the power of appointment.  This action constitutes a violation of the federal constitution and entitles Plaintiffs to injunctive relief.  *Duncan,* 657 F.2d at 704.

> 2.      *In the Alternative, if Georgia Law Allowed Defendant Raffensperger to Cancel the Election, Georgia Law, and Defendant Raffensperger's actions thereunder, violated the United States Constitution*

In the alternative, if Georgia law is not violated by Secretary Raffensperger's failure to hold an election for Justice Blackwell's position on the Georgia Supreme Court, Georgia law, and Secretary Raffensperger's actions thereunder, violate the United States Constitution.

In *Burdick v. Takushi,* 504 U.S. 428, 438  (1992), the United States Supreme

Court articulated the test for determining whether a state election law violated the

United States Consitution:

> A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interest put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

504 U.S. at 438 (quoting *Anderson v. Celebrezze,* 460 U.S. 780 (1983)).[2]

Under *Burdick,* the first issue is the magnitude of the asserted burden on the

right to vote.   In this case, Plaintiffs are not merely inconvenienced; their right to

vote in the election for Justice Blackwell's seat has been taken away entirely.

"Burdens are severe if they go beyond the merely inconvenient."  *Crawford v.*

*Marion Cty. Election Bd.,* 553 U.S. 181, 205 (2008) (Scalia, J., concurring in the

judgment).

---

[2] The fact that the State of Georgia is not required under the U.S. Constitution to have elections for justices does not have an impact upon the *Burdick* test.  "The need for exacting judicial scrutiny of statutes distributing the franchise is undiminished simply because, under a different statutory scheme, the offices subject to election might have been filled through appointment." *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 628–29 (1969).

When, as here, the rights of voters are subjected to "severe" restrictions, the regulation must be "'narrowly drawn to advance a state interest of compelling importance.'" *Burdick,* 504 U.S. at 434 (quoting *Norman v. Reed,* 502 U.S. 279, 289 (1992)).

The cancellation of the election for Justice of the Georgia Supreme Court does not advance any legitimate state interest, much less an interest of compelling importance.  The State may have a legitimate interest in allowing the Governor to appoint a Justice to fill an actual vacancy in the Georgia Supreme Court created by a bona fide resignation by a sitting Justice.  Further, if a new Justice is actually appointed, the State may also have an interest in allowing the appointed Justice to serve longer than the unexpired term of the vacating Justice even at the expense of an intervening election.  If there is no actual vacancy to fill, however, the State has no interest, much less a compelling interest, in filling that vacancy.  Further, if there is no Justice appointed to fill the (non-existent) vacancy, there is no interest, much less a compelling interest, to extend the term of the vacating Justice.

Thus, the only purpose served by cancelling an election when there is no actual vacancy is to avoid an election – that is, to disenfranchise voters.  The disenfranchisement of voters is a constitutional violation, not a legitimate State interest.

A review of state restrictions on the franchise that have been held to advance a sufficient state interest demonstrates the unconstitutionality of Secretary Raffensburger's actions in this case.  For example, burdens on the right to vote could be justified based on the state's interest in preventing fraud, in counting only the votes of eligible voters, in the orderly administration of elections, in equal treatment of partisan and independent candidates, or in promoting voter confidence in the integrity of elections.  *See generally Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008); *Anderson,* 460 U.S. at 796. The cancellation of the election for Justice Blackwell's successor, however, serves none of these interests.

The State has a very strong interest in maintaining the integrity of the Georgia Supreme Court. As Justice Benham observed in *Mayor & Aldermen of City of Savannah v. Batson-Cook Co.,* 291 Ga. 114, 114 (2012), "Judicial integrity is "a state interest of the highest order" because the power and prerogative of a court to resolve disputes rests upon the respect accorded by citizens to a court's judgments which, in turn, depends upon the issuing court's absolute probity."  With respect, there is no argument that can be made that calling a November resignation a February vacancy promotes this interest.

The argument may be advanced that the state has an interest in cancelling the election for Justice Blackwell's replacement because such an election will be

22

"mooted" anyway when Governor Kemp fills the vacancy created by Justice Blackwell's actual retirement on November 18, 2020.  Under this "post-election appointment" theory, even though the people had already elected a justice to a six year term pursuant to Art. VI, Section VII, Paragraph I(a), because Justice Blackwell decided to end his tenure several weeks shy of his six year term, the Governor would appoint his successor in November, 2020.  And, this theory goes, under the Georgia Constitution, the appointee's term will last from his appointment until January 1, 2023, thereby nullifying the results of this year's election.  There are multiple flaws in this argument.

First, it is highly doubtful that Georgia law even allows a post-election appointment.  The appointment power, again, is triggered when a death or resignation triggers a vacancy, and if a successor has already been elected, there is no vacancy requiring the Governor to appoint a justice for a multi-year term.  Second, even if Georgia law allowed a post-election appointment to nullify a popular election (and all the mischief that would invite),[3] it is highly doubtful that

---

[3] For example, under the Secretary's interpretation of the law, a sitting justice could run for re-election and *lose,* and then resign before his term has run, and be appointed by the Governor anyway.  Or, a sitting justice could not run for re-election but, if the sitting justice and the Governor do not like the results of the election, the sitting justice could resign after the election and the Governor could appoint the candidate who lost the election.

a Governor would use that power to nullify the results of a popular election. Indeed, the historical precedent is to the contrary.  For example, Court of Appeals Judge A. W. Birdsong announced his retirement a few months before his death on June 6, 1998,[4] while the election for his replacement was ongoing.  On July 21, 1998, Anne Barnes won a 3-way non-partison primary for Judge Birdson's seat without a runoff, and Judge Barnes took office January 1, 1999.[5]  Even though Judge Birdsong's vacancy occurred on the eve of the election for his successor (and thus could have been filled by gubernatorial appointment), nonetheless Governor Miller chose not to cancel an election that was already underway.  The result was that Judge Barnes was elected successor to Judge Birdsong's seat, and took her seat on the Court of Appeals on January 1, 1999.

Again, the only possible justification for cancelling the election for Justice Blackwell's successor is that such an election would *inevitably* be mooted by the Governor's appointment after Justice Blackwell creates a vacancy with his actual resignation on November 18, 2020.  But the example of Governor Miller and Judge

---

[4] https://www.gaappeals.us/history/judges.php?id=51

[5] https://www.gaappeals.us/history/judges.php?id=65

Barnes shows that Governor Kemp might respect the will of the people, either because it is politically wise or the simply because it is the right thing to do.

Governor Miller's decision to not disenfranchise the voters in Judge Barnes' election also shows with great clarity how the Secretary's cancellation of the election not only defeats the Plaintiffs' right to vote, but also does harm to other vital state interests.  Cancelling the election takes from Governor Kemp any discretion to follow Governor Miller's example and *not* make a late-term appointment.  Unless this Motion is granted, there will be no elected Justice to succeed Justice Blackwell on the bench on January 1, 2021, and Governor Kemp will not be able to do what Governor Miller did even if he wanted to.  It cannot be in the State's interest to take from Governor Kemp that discretion.

The only interests served by treating Justice Blackwell's February resignation as one that created a vacancy (when it undisputably did not create a vacancy) is the personal political interests of those in power.  Treating Justice Blackwell's notice of retirement as a genuine retirement, and allowing it to cancel an election, allows Governor Kemp to escape the political consequences of making a disenfranchising, post-election, late-term appointment.  Giving political cover to the Governor is not a "state interest of compelling importance." *Burdick,* 504 U.S.

at 434 (citation omitted).  Instead, it promotes "purely personal and arbitrary power."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).[6]

In sum, the only purpose served by Justice Blackwell's advance notice of his anticipated resignation, and the Governor's immediate acceptance of that advance notice, was to give the Governor and the Secretary of State an argument (as thin as it is) to cover an otherwise naked exercise of executive power to appoint a Justice that the people of this State are entitled to elect.  Because that is not a legitimate, much less compelling, justification to disenfranchise voters, the Secretary's action "under color of state law" violates the United States Constitution.  Plaintiffs are therefore likely to succeed on the merits of their claims.

---

[6] As the Court stated in *Yick Wo:*

> When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts.

118 U.S. at 370.

### B.     Plaintiffs are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief

If this Motion is not granted, Plaintiffs will be harmed by not having the

opportunity to vote for Justice Blackwell's successor on the Georgia Supreme

Court.  This harm is by its very nature irreparable.   "The threatened, ongoing

injury here is an irreparable injury – one that goes to the heart of the Plaintiffs'

participation in the voting process and our democracy."  *Curling v. Raffensperger,*

397 F. Supp. 3d 1334, 1402 (N.D. Ga. 2019); *Dillard v. Crenshaw County*, 640

F.Supp. 1347, 1363 (M.D. Ala.1986) ("Given the fundamental nature of the right

to vote, monetary remedies would obviously be inadequate in this case; it is simply

not possible to pay someone for having been denied a right of this importance.").

### C.     Balance of Equities Favor Granting the Injunction

The balance of equities tip heavily in Plaintiffs favor.  On the one hand, the

weight of Plaintiffs' equities is substantial.  "No right is more precious in a free

country than that of having a voice in the election of those who make the laws

under which, as good citizens, we must live.  Other rights, even the most basic, are

illusory if the right to vote is undermined."  *Wesberry,* 376 U.S. at 17.

On the other hand, the injunction will not cause Secretary Raffensperger

harm, but will merely require the Secretary to do what he intended to do before he

27

made the errant decision to cancel the election: take all steps necessary to conduct the nonpartisan general election previously set and noticed for the position of Justice of the Supreme Court in the seat currently occupied by Justice Blackwell.

### D.    Granting in the Injunction is in the Public Interest

The public interest heavily favors the granting of the injunction.  It cannot be in the public interest to allow the Governor to appoint a Supreme Court Justice when he does not have the statutory, or constitutional, right to do so.

It is further in the public interest to require the Secretary to conduct this election on the date of the general primary, currently set for June 9, 2020, in accordance with O.C.G.A. § 21-2-138.   The selection of the general primary reflects two choices on the part of the General Assembly: First, that such elections should not be conducted on the date of the general election in November, for a whole host of reasons, not the least being that it would force candidates for nonpartisan office to compete with candidates for the most partisan offices in the most expensive of election dates on the election calendar.

Second, the largest number of eligible voters likely to participate in a statewide election other than the date of the general election in November is the date of the general primary earlier in the year.  Any statewide election scheduled for any other date would unduly burden statewide voters by requiring yet another

trip to the polls for a lesser office, for the vast majority of voters the only election that they would be eligible to vote in.  This would therefore garner the smallest number of eligible voters possible.

For both of these reasons, the date fixed by state law for the conduct of the nonpartisan general election for Supreme Court Justice is the date of the general primary this June.  Meanwhile, there is no time for delay, because the Secretary is already mailing absentee ballots to voters requesting an absentee ballot for the general primary election.  *See* "Ballots begin to be mailed to Georgia voters for June 9 primary," *Atlanta Journal Constitution*, April 22, 2020.

Expediting these proceedings, clearly in the public interest, will not prejudice the Secretary in any way whatsoever.  This case presents a clear question of law, and the Secretary has been on notice of these claims for months.

For the foregoing reasons, the Motion should be granted.

Respectfully submitted this 24th day of April, 2020.

/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700
*Attorney for Plaintiffs*

29

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Complaint has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

<u>*/s/ Bruce P. Brown*</u>
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
Attorney for Plaintiffs
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2020, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

/s/ Bruce P. Brown
Bruce P. Brown

EXHIBIT

1

Fulton County Superior Court
***EFILED***TB
Date: 3/13/2020 8:51 AM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| JOHN BARROW,                ) | |
|                                            ) | |
|                Petitioner,       ) | CIVIL ACTION FILE NO. |
|                                            ) | |
| v.                                         ) | |
|                                            ) | 2020CV334031 |
| BRAD RAFFENSPERGER, in his official  ) | |
| capacity as Georgia Secretary of State,  ) | |
|                                            ) | |
|                Respondent.    ) | |
| _____ ) | |

## STIPULATIONS REGARDING TESTIMONY OF ASSOCIATE JUSTICE OF THE SUPREME COURT KEITH R. BLACKWELL

Associate Justice of the Georgia Supreme Court Keith R. Blackwell was subpoenaed to appear at the hearing on Petitioner's Petition for Writ of Mandamus.  In lieu of Associate Justice Blackwell's appearance pursuant to the subpoena, Petitioner and Respondent stipulate that Associate Justice Blackwell's uncontroverted testimony would have been as follows:

1. I was appointed to the Georgia Court of Appeals on November 1, 2010.

2. Governor Nathan Deal announced my appointment to the Georgia Supreme Court in June 2012, and I took office as a Justice of the Supreme Court in July 2012.

3. On May 20, 2014, I was elected to a six-year term as Associate Justice of the Georgia Supreme Court.

4. On January 1, 2015, I began my six-year term as Associate Justice of the Georgia Supreme Court.

5. Had I desired to continue to serve on the Georgia Supreme Court beyond December 31, 2020, I would have had to qualify to run for office between March 2, 2020 and March 6, 2020.  I would have had to run in the non-partisan general election on May 19, 2020.

6.  On February 26, 2020, I submitted my letter to Governor Brian P. Kemp.  The effective date of my resignation was November 18, 2020.  The letter is attached as Exhibit A and stipulated to as to authenticity and to admissibility in the record.

7.  On February 26, 2020, Governor Kemp accepted my letter expressing my intent to resign effective November 18, 2020.  The letter is attached as Exhibit B and stipulated to as to authenticity and to admissibility in the record.

8.  On February 28, 2020, I authored two opinions and participated in eighteen additional opinions while executing my duties as an Associate Justice on the Supreme Court.

9.  I continue to be subject to my oath of office.

10. I continue to occupy the office of Associate Justice of the Georgia Supreme Court.

11. I have chambers at the Nathan Deal Judicial Building.

12. I supervise law clerks.

13. I hear oral arguments.

14. I participate in conferences among the Justices of the Georgia Supreme Court.

15. I author opinions.

16. I author dissents, as appropriate.

17. I vote to grant or deny certiorari for cases under consideration.

18. I vote on all cases in which I am not recused or otherwise elect not to participate.

19. I receive a pay check from the State of Georgia.

20. I continue to accrue retirement benefits and receive insurance from the State of Georgia.

21. I lawfully exercise judicial power.

22. I plan to participate in the scheduled oral arguments on March 17, 2020; March 19, 2020; April 21, 2020; and April 23, 2020.

23. I plan to continue to lawfully execute my duties as an Associate Justice of the Georgia Supreme Court until November 18, 2020.

24. I plan to continue all of the duties outlined above until November 18, 2020.

25. I plan to continue to receive all of the benefits of my employment as an Associate Justice of the Georgia Supreme Court, including but not limited to retirement benefits, insurance, and salary, until November 18, 2020.

This Stipulation is agreed to and entered on behalf of Petitioner, this 12th day of March, 2020.

<div style="margin-left:40%">

*/s/ Wade H. Tomlinson, III*
WADE H. TOMLINSON, III
Georgia Bar No. 714605
**Pope, McGlamry, Kilpatrick, Morrison & Norwood, P.C.**
3391 Peachtree Road, NE, Suite 300
P.O. Box 19337 (31126-1337)
Atlanta, GA  30326
(404) 523-7706
triptomlinson@pmkm.com
efile@pmkm.com

S. LESTER TATE, III
Georgia Bar No. 698835
**Akin & Tate**
P.O. Box 878
Cartersville, GA 30120
(770) 382-0780
lester@akin-tate.com

*Attorneys for Petitioner*

</div>

3

This Stipulation is agreed to and entered on behalf of Respondent and Associate Justice Keith Blackwell, this 12th day of March, 2020.

*/s/ Russell D. Willard*
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
State Law Department
40 Capitol Square SW
Atlanta, GA 30334
Tel: (404) 656-7298
Fax: (404) 651-5304
Email: rwillard@law.ga.gov

*Attorney for Respondent*

# EXHIBIT A



**SUPREME COURT OF GEORGIA**
STATE JUDICIAL BUILDING
ATLANTA, GEORGIA 30334

KEITH R. BLACKWELL
JUSTICE

(404) 656-3471

February 26, 2020

The Honorable Brian P. Kemp
Governor of the State of Georgia
The State Capitol
Atlanta, Georgia

Dear Governor Kemp:

I count as the greatest honors of my professional life to have
served as a Justice of the Supreme Court of Georgia and as a Judge of
the Court of Appeals of Georgia. In my years of judicial service, I have
been especially privileged to serve alongside my former and present
colleagues, talented and tireless men and women who reflect—by their
integrity, their collegiality, their professionalism, their scholarship, and
their shared commitment to the rule of law and the principle of equal
justice under the law—the highest standards of public service. It also
has been my privilege to work with the uncommonly dedicated
professionals who serve as staff for the Supreme Court and Court of
Appeals. I am forever grateful to Governor Perdue, Governor Deal, and
the People of Georgia for affording me the opportunity to serve.

Although I would be pleased to continue my judicial service for
several more years, my obligations to my family have led me to consider
another course. Our oldest daughter will leave for college in only a
couple of years, and her sisters will follow not long behind. After
considerable deliberation, discussion with Angela, and prayer, I have
decided that it is best for my family that I return to the private practice
of law. To that end, I will conclude my judicial service at the end of the
August Term of the Supreme Court, a date sufficiently distant to
avoid—in light of the imminent retirement of Justice Robert Benham—

1

the disruption in the important work of the Court that otherwise might follow after the departure of two sitting Justices and the appointment of two new Justices close in time. Please accept my resignation from the Supreme Court, effective November 18, 2020.

I wish you every success during the remainder of your administration.

Respectfully yours,

Keith R. Blackwell

2

# EXHIBIT

# B



**STATE OF GEORGIA**

OFFICE OF THE GOVERNOR

ATLANTA 30334-0900

Brian P. Kemp
GOVERNOR

February 26, 2020

The Honorable Keith R. Blackwell
Supreme Court of Georgia
330 Capitol Avenue, S.E.
Atlanta, Georgia 30334

Dear Justice Blackwell:

Thank you for the service you have rendered as Justice of the Supreme Court of Georgia. I appreciate you taking the time to apprise me of your resignation, effective November 18, 2020.

Your resignation as Justice of the Supreme Court of Georgia is hereby accepted, and I wish you all the best. Once again, thank you for your service to the state of Georgia.

Sincerely,

Brian P. Kemp

BPK:rcb

cc:     The Honorable Brad Raffensperger, Secretary of State

EXHIBIT

2



SUPREME COURT OF GEORGIA
Case Nos. S20A1029, S20A1031

April 3, 2020

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

JOHN BARROW v. BRAD RAFFENSPERGER.
ELIZABETH BESKIN v. BRAD RAFFENSPERGER.

Having reviewed the expedited briefs of the parties, the Court has determined that it could provide adequate remedies to the appellants in the event they prevail (a matter as to which the Court expresses no opinion whatsoever at this time) even after absentee ballots are distributed for the May 19, 2020, nonpartisan general election. Accordingly, the Court will not issue an immediate opinion in these cases, although an opinion will be issued as soon as practicable.

*Melton, C. J., Nahmias, P. J., Warren, J., and Judges Scott L. Ballard, Brenda Holbert Trammell, Richard M. Cowart, Sarah F. Wall, and Timothy R. Walmsley concur. Blackwell, Boggs, Peterson, Bethel, and Ellington, JJ., not participating.*

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

, Clerk