**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ANNE GLENN WELTNER, FRANCYS )
JOHNSON, and LAURA REGISTER )
                                    )
                                    )
       Plaintiffs;             )       CIVIL ACTION FILE NO.:
                                    )
vs.                              )       1:20-CV-1407-ODE
                                    )
BRAD RAFFENSPERGER,        )
SECRETARY OF STATE,         )
STATE OF GEORGIA,            )
                                    )
       Defendant.            )

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Defendant Brad Raffensperger, in his official capacity as the Secretary of State of Georgia (hereinafter "Defendant" or "the Secretary"), respectfully submits this brief in support of his Motion to Dismiss Plaintiffs' Complaint.

## <u>BACKGROUND</u>

### I.   FACTS

Justice Keith R. Blackwell is an Associate Justice of the Supreme Court of Georgia.  Doc. 1, ¶ 12.  He was elected to his current term of office, which began January 1, 2015, and was set to expire December 31, 2020.  *Id*.

On February 26, 2020, however, Justice Blackwell notified Governor Brian Kemp by letter that he wished to resign his position effective November 18, 2020, "a date sufficiently distant to avoid – in light of the imminent retirement of Justice

Robert Benham – the disruption in the important work of the court." *Id.* at ¶14. The Governor responded in a letter dated the same day that Justice Blackwell's "resignation, effective November 18, 2020," "is hereby accepted." *Id.* at ¶15.

Governor Kemp notified Secretary of Raffensperger that Governor Kemp would fill Justice Blackwell's seat by appointment, and the Secretary determined that Blackwell's seat should be removed from the list of offices to be filled by election *in 2020*. Doc. 1, ¶18, 19. Secretary Raffensperger also directed his staff to publicize his decision and to notify any individuals who had attempted to submit qualification materials for the position. *Id.*

## II.   PROCEDURAL HISTORY AND RELATED LITIGATION

Plaintiffs filed this action on March 31, 2020, asserting two claims for relief under 42 U.S.C. §1983. Count I alleges that the cancellation of the election was contrary to Georgia law and, as a violation of state law depriving them of the right to vote, violated their substantive due process rights. *Compl.* at 21-38 (citing *Duncan v. Poythress,* 657 F.2d 691 (5th Cir. 1981). Count II alleges that even if Georgia law does provide for an appointment under these circumstances, that this would violate their due process rights. *Compl.* at 39-54.

Over three weeks later, Plaintiffs filed a Motion for Preliminary Injunction ("MPI"). Doc. 7.While the MPI was pending, the Georgia Supreme Court rejected substantially the same claims brought by two would-be candidates for Justice

Blackwell's seat. *See Barrow v. Raffensperger,* S20A1029 (Ga. 2020); *Beskin v.*

*Raffensperger,* S20A1031 (Ga. May 14, 2020) (hereinafter "Barrow/Beskin"). Like

Plaintiffs here, Barrow and Beskin argued that because Justice Blackwell will not

physically leave office until November 18, 2020 (after the May election would

have been held) there was no vacancy which the Governor could fill by

appointment, and the election should be held. Additionally, like Plaintiffs here,

Appellant Beskin asserted a 42 U.S.C. §1983 due process claim under *Duncan v.*

*Poythress.*

The Georgia Supreme Court found that the *Barrow/Beskin* plaintiffs' claims

were properly denied. The Court held that because Justice Blackwell had

unequivocally and irrevocably resigned, his seat would become vacant before the

end of his regularly scheduled term (December 31, 2020) – and the Governor must

appoint a replacement. *Id.* at 33-34. By operation of Georgia law, there are no

longer appointments to fill unexpired terms of judicial officers; instead, a judicial

office that becomes vacant mid-term is filled by judicial appointment.  *Id.* at 34.

Thus, for the seat held by Justice Blackwell until his resignation, the vacancy

created by his resignation is filled by a gubernatorial appointee who serves a term

until their successor is elected in 2022.  *Id.*  Thus, the court found that the

Secretary's decision to cancel the election comported with state law –  and rejected

both the plaintiffs' mandamus requests and Beskin's *Duncan*-based §1983 claims.

Following that decision, this Court denied the plaintiffs' MPI in part on May 18, 2020. *See* Doc No. 15. In doing so, this Court recognized that the Plaintiffs' *Duncan* claims under Count I were foreclosed by the Georgia Supreme Court's ruling that Georgia law provided for the seat to be filled by appointment. *Id.* at 16-18. As to Count 2, the Court noted that the Plaintiff's originally-requested relief was no longer feasible, and  ordered the Plaintiffs to specify by May 28, 2020 "what action – if any – they ask the Court to take if the Court finds relief is warranted." *Id.* at *19-20. The Court also noted that, in doing so, "it has made no decision on Count II."[1]

## STANDARD OF REVIEW

Fed.R.Civ.P. 12(b)(1) provides that lack of subject matter jurisdiction may be raised in a motion made before pleading. Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. **1**2(b)(1)." *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991).

---

[1] On May 28, 2020, the Plaintiffs responded to this Court's order, indicating that their rights "would be redressed if there is an election for Justice Blackwell's seat on August 11, 2020, which is the date of the run-off elections for the June 9 [primary elections], or any date to, and including, November 3, 2020, which is the date of the general election." Doc. 17. Additionally, "Plaintiffs also seek a directive that the Secretary take all reasonable steps to conduct the election, including setting a reasonable qualifying period." *Id.* The Secretary's response to Plaintiff's submission is due June 8, 2020.

4

Under Rule 12(b)(6), a complaint is subject to dismissal if it does not "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). Plaintiffs are not entitled to the benefit of legal conclusions and other conclusory allegations in the complaint. *Id*

To state a claim under 42 U.S.C. § 1983, the plaintiff must show that state action "deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992) (citing *Flagg Brothers*, *Inc. v. Brooks*, 436 U.S. 149, 156-57 (1978)). Thus, a complaint under section 1983 must allege facts which plausibly allege a violation of their constitutional rights.

## ARGUMENT AND CITATION OF AUTHORITY

**I.   COUNT I OF PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED IN LIGHT OF THE GEORGIA SUPREME COURT'S DECISION IN BARROW/BESKIN.**

As this Court correctly noted in its Order on Plaintiffs' MPI, the Georgia Supreme Court's decision in *Barrow* and *Beskin* is "determinative of Count I of Plaintiffs' Complaint." Doc. 15, p. 18. This Court having already denied Plaintiff's Motion for Preliminary Injunction as to this Count, all that remains is for the Court

to enter an order dismissing Count I pursuant to Fed.R.Civ.P. 12(b)(6)[2]. Count I raised claims under 42 U.S.C. § 1983 based on a claim that Defendant's cancellation of the election for Justice Blackwell's successor violated Georgia law. The Georgia Supreme Court having concluded otherwise, Plaintiffs' *Duncan*-based §1983 claims, like those of Appellant Beskin, fail to state a claim upon which relief may be granted, and Count I of their Complaint should be dismissed. *See Blue Cross & Blue Shield v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997) ("The final arbiter of state law is the state supreme court, which is another way of saying that Alabama law is what the Alabama Supreme Court says it is."); *Cromartie v. Shealy*, 941 F.3d 1244, 1254 (11th Cir. 2019) ("When evaluating a facial challenge to the constitutionality of a state [law], we analyze the statute as authoritatively construed by the state's courts.")

---

[2] Plaintiff has now sought leave of court to file a brief that asks this Court to disregard and functionally overrule the *Barrow/Beskin* decision. Doc. 19. Defendant will file a timely response to that motion, but notes that Plaintiffs are asking this Court to disregard the long-standing principle that federal courts are bound to accept the interpretation of Georgia's law by the highest court of the state. *See, e.g. Hortonville Joint School Dist. v. Hortonville Education Asso.*, 426 U.S. 482, 488 (1976). This Court has already recognized the binding effect of *Barrow/Beskin* and should not countenance Plaintiffs' attempt to lead it into a breach of fundamental principles of federalism.

**II.   PLAINTIFFS LACK STANDING TO PURSUE THEIR COUNT II CLAIMS BECAUSE THEY CANNOT DEMONSTRATE THAT DEFENDANT VIOLATED ANY RIGHT CONFERRED UPON THEM BY THE 14TH AMENDMENT TO THE U.S. CONSTITUTION.**

Defendant is mindful of the fact that the Court in its Order of May 18, 2020, determined that Plaintiffs have standing to pursue their claims. Doc. 15, p. 15. However, as Fed.R.Civ.P. 12(b)(1) requires that a party assert any defenses to lack of jurisdiction over the subject matter in a motion made before a responsive pleading, it remains proper for Defendant to raise issues of standing in this Motion. *See, e.g. Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 807 at n. 8 (11th Cir. 1993)( "Because a motion to dismiss for lack of standing is one attacking the district court's subject matter jurisdiction, it is brought pursuant to Rule 12(b)(1)."). And, with Count I of Plaintiffs' Complaint having been eliminated, the now-certain absence of a state-law claim presents a new deficiency of standing specific to Count II of Plaintiffs' Complaint that warrants further exploration[3].

Until the Supreme Court issued its ruling in *Barrow/Beskin*, Plaintiffs could at least set forth a cognizable, if ultimately unsuccessful, claim that Defendant may

---

[3] While Defendant continues to maintain that Plaintiffs also lack standing as to Count I of their Complaint, given this Court's disposition of Count I on the merits, there appears to be no practical need to further address standing as it relates to Count I at this time. However, no waiver is intended by this decision, and Defendant reserves the right to address standing issues related to Count I should it become appropriate in the future.

have violated rights conferred upon them by the Constitution of the State of
Georgia. Now, however, the Georgia Supreme Court has made it clear that no
violation of Georgia's Constitution has occurred.

Therefore, to have standing to continue to maintain this action after
*Barrow/Beskin*, Plaintiffs must identify some other legal right that they may claim
Defendant has violated. In the absence of any right given to them under Georgia
law, Plaintiffs have no justiciable claim unless they can persuade the Court to
recognize an independent Federal right to vote for Justice Blackwell's successor
that should override the Georgia Constitution's provision that the position shall be
filled by appointment.

Plaintiffs hope to persuade this Court to find such a right to be somehow
implicit in the 14th Amendment's guarantee of substantive due process. However,
while substantive due process may protect the right to vote when such a right has
been granted by a state or federal election law, it does not confer a right to vote for
an officer that a state has chosen to select by appointment. Because Plaintiffs
cannot credibly claim that Defendant has violated any right conferred upon them
by the 14th Amendment, this Court lacks jurisdiction over Count II of Plaintiffs'
Complaint.

The "irreducible constitutional minimum" of standing requires, at this stage
of the litigation, that Plaintiffs' complaint must allege facts sufficient to

demonstrate the three key elements of standing: (1) an injury in fact; (2) that the injury is fairly traceable to the actions of the defendant; and (3) that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The first element of standing – injury in fact – requires that Plaintiffs to allege that they have suffered "an invasion of **a legally protected interest** which is (a) concrete and particularized … and (b) "actual or imminent, not 'conjectural' or 'hypothetical…'" *Id.* (citations omitted) (emphasis added).

Not all claims of injury are justiciable in federal courts; whether an injury is justiciable "often turns on the nature or source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). To set forth a justiciable injury, Plaintiffs must identify a constitutional or statutory legal right, "the invasion of which creates standing." *Id.* "The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan*, 443 U.S. 137, 140, 99 S. Ct. 2689, 2692, 61 L. Ed. 2d 433 (1979).

The Constitution "does not confer the right of suffrage upon any one," and "the right to vote, *per se*, is not a constitutionally protected right." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982). The Constitution does not prescribe any particular method by which states must choose their judges. Nor does the Constitution embody any preference for the election of judicial

9

officers over appointment; indeed, it provides that members of the federal judiciary are to be appointed rather than elected. There is "no constitutional reason why state or local officers of the nonlegislative character involved here may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election." *Sailors v. Board of Educ.*, 387 U.S. 105, 108 (1967). States are free to determine whether to fill judicial offices by election, appointment, or some combination thereof, and the choices made by states across the country have varied widely. *See Republican Party v. White*, 536 U.S. 765, 790 (2002) (*J. O'Connor, concurring)* (describing the history and variety of state's choices of methods for selecting judges).

Any "right to vote" for a Georgia judicial officer, therefore, is not conferred upon Plaintiffs by the 14th Amendment's guarantee of substantive due process. It exists if, and only if, Georgia law provides for the election of that officer. As to Justice Blackwell's successor, Georgia law provides that he or she is to be chosen by gubernatorial appointment. The 14th Amendment does not provide otherwise, and cannot "properly … be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth, supra* at 500[4]. As such, an

---

[4] While the absence of a federal right to vote for Justice Blackwell's successor is also determinative as to the merits of Count II, and is therefore discussed in more detail in Section III *infra*, *Warth* recognizes that the prudential rules of standing require that the court determine whether there is a constitutional or statutory provision upon which a plaintiff's claim rests, independently of any decision on the

adjudication of their claims would "be barred by the prudential rules of standing." *Id.* Therefore, Count II of Plaintiffs' Complaint should be dismissed for lack of standing.

### III.   COUNT II SHOULD BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

If this Court were to find that Plaintiffs have standing to pursue their Count II claims, these claims should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for two reasons. *First,* there is no constitutionally protected interest in voting for a position state law fills by appointment. *Second,* even if there were, Georgia's vacancy-appointment system strikes a reasonable balance between democracy and stability — and any hypothetical potential for abuse is not presented here and does not change the analysis on the facts alleged.

The starting point for the analysis here is that states have constitutional and regulatory authority to ensure the integrity and efficiency of elections. U.S. Const. Art I, s.4 cl.1; *cf. Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Wexler v.*

---

merits. "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal…it often turns on the nature and source of the claim asserted…[T]he source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, *supra,* 422 U.S. at 500 (citations omitted).

*Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006). That authority is even greater here, because the regulation at issue involves the sovereign decision of how the state of Georgia structures and fills its public offices. As an "autonomous political entity[,] 'sovereign over matters not ruled by the Constitution'" the state's choice of how "to structure the [state's] electoral system [is] entitled to *substantial* deference." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 8 (1982) (emphasis added) (punctuation omitted). As the former Fifth Circuit explained in *Duncan,* "we have specifically recognized that states enjoy broad authority to *dispense* with the elective process and provide by law that judicial vacancies shall be filled by gubernatorial appointment." 657 F.2d at 702; citing *Holley v. Askew,* 583 F.2d 728 (5th Cir. 1978). Moreover, courts "should accord weight" to the State Supreme Court's "assessment of the justification and need for particular provisions to fill vacancies." *Rodriguez,* 457 at 8.

With that in mind, when a state does choose to confer a right upon its citizens to vote for a particular office, "[a] court considering a challenge to a state election law must [1] weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' [2] against 'the precise interest put forward by the State as justifications for the burden imposed by its rule,' [3] taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' "

*Burdick v. Takushi*, 504 U.S. 428, 438 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780 (1983)).

>   a. **There is no federally protected right to vote for an office which state law fills by appointment.**

Count II essentially claims that if state law does permit Justice Blackwell's seat to be filled by appointment here (as we now definitively know that it does), then Georgia's vacancy-appointment system infringes Plaintiffs' "Right to Vote in violation of the Fourteenth Amendment's Guarantee of Due Process." *Compl.* at 39-54. That submission is ultimately self-defeating. If state law provides that vacancies in a public office are filled by appointment (rather than election) under given circumstances, then there is no burden on the right to vote, because the Plaintiffs *have* no right to vote for that position.

To begin with, the Constitution does not mandate a particular method of filling vacancies. *See Rodriguez,* 457 U.S. at 9. ("No provision of the Federal Constitution expressly mandates the procedure that a state . . . must follow in filling vacancies in its own legislature"). Indeed, the Supreme Court "[has] previously *rejected* claims that the Constitution compels a fixed method of choosing state or local officers." *Id.* (citing *Fortson v. Morris*, 385 U.S. 231, 234 (1966) (emphasis added). "To be sure, when a state . . . has *provided* that its representatives are elected, 'a citizen has a constitutionally protected right to participate in elections *on an equal basis with other citizens* in the jurisdiction.'"

13

*Id.* (citing cases) (emphasis added).[5] Yet here, just as in *Rodriguez,* the law at issue "does not restrict access to the electoral process or afford unequal treatment *to different classes of voters or political parties.*" *Id.* at 10. That being so, Plaintiffs' claims here *necessarily* fail, because the Supreme Court "has often noted that the constitution 'does not confer the right of suffrage upon anyone,' and 'the right to vote, *per se,* is not a constitutionally protected right." *Id.*

To put it another way:  when Georgia law provides that a position is electable, the United States Constitution protects voters right to participate in that election on an equal basis (and, indeed, to speak and associate for purposes of advancing their beliefs). But where, as here, Georgia law provides that a seat is *properly* filled by appointment, no federally protected right is implicated.[6]

---

[5] In their Complaint and Motion for Preliminary Injunction, Plaintiffs relied in particular on *Kramer v. Union Free School District*, 395 US 621, 626-629 (1969), *see* Complaint at ¶ 52 and MPI at 20, but that case further illustrates the point: True, "[t]he need for exacting judicial scrutiny of statutes distributing the franchise is undiminished simply because, under a different statutory scheme, the offices subject to the election might have been filled through appointment." *Id.* But, consistent with its various other statements in innumerable cases, the Supreme Court went on to say "[s]tates do have latitude in determining whether certain public officials shall be selected by election or chosen by appointment" but "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Id.* Here, no voter is treated differently than any other: to the extent anyone's "right to vote" is burdened —all Georgia voters are in exactly the same boat. Thus, no federally protected right is implicated.

[6] Paragraph 41 of the complaint rightly states "[t]he United States Constitution does not require that state justices be elected. Once the State decides that justices

This is precisely what the Sixth Circuit held — in virtually the same context presented here — in *Moncier v. Haslam*, 570 Fed. Appx. 553, 559 (6th Cir. 2014). There, just as here, state law provided that the Governor would fill judicial vacancies created by appointment, and the challenger claimed that the law violated his First and Fourteenth Amendment rights. *See id.* The Sixth Circuit explained that "there is no federally protected interest in seeking a state-court judgeship that, under state law (as interpreted by the state supreme court), already has been lawfully filled by gubernatorial appointment." *Id.* at *559 (citing *Snowden v. Hughes*, 321 U.S. 1, 7 (1944) ("the right to become a candidate for state office . . . is a right or privilege of state citizenship")). Tennessee's vacancy system mirrors that of Georgia in requiring appointees to stand for election after an intervening period of time discharging the duties of the office, albeit the Tennessee system varies in an immaterial fashion from Georgia's system in that Tennessee appointees are subject to a "retention election" (in which voters cast "yes" or "no"

---

are to be elected, however, the State may not invidiously, arbitrarily, or unreasonably disenfranchise voters." That is exactly right: Federal Constitutional rights are implicated where state law provides for an election. But, as the Georgia Supreme Court has now authoritatively held, state law does not provide for an election here; it provides for an appointment and a new term. Thus, no federal constitutional rights are implicated. That conclusion does not change simply because the office in question is electable as a general matter, but appointable when there is a vacancy (regardless of when it occurs during the term). If it did, no vacancy-appointment system could pass constitutional muster.

votes for the appointee to serve beyond the appointed term); nothing in the Sixth
Circuit's decision turned on that difference. Nor did anything turn on the fact that
(as of the time the court decided the case) the particular seat there had been filled
by appointment. Instead, the controlling principle — equally applicable here — is
that there is no right to vote for a position where the applicable state law
contemplates that the vacancy in the office will be filled by appointment.[7]

Further, and just as in *Moncier*, Plaintiffs' reliance on the Anderson-Burdick
framework does not alter this conclusion. As the Sixth Circuit reasoned: "[b]oth
*Anderson* and *Burdick* presupposed that state law required an election for a
particular office … [n]either case mandated …  the election of state-court judges"
and neither purported to "stipulate when states may deem a particular office vacant
or specify how states must fill those vacancies." *Id*. Thus, "[Plaintiffs'] reliance on
Anderson and Burdick falls short because [they have] no recognized right under
the United States Constitution" to vote for Justice Blackwell's seat under these
circumstances. *See id; see also Moncier v. Haslam,* No. 3:14-CV-353, 2014 WL
4680897 at *3-4 (E.D. Tn. 2014) (rejecting successive challenge by same plaintiff,
for lack of standing and failure to state a claim, because "there is no federally
protected interest" in appearing on the ballot for a judgeship state law filled via

---

[7] While the court disposed of that case on standing grounds, the Sixth Circuit made
clear "dismissal would have been equally appropriate under Federal Rule of Civil
Procedure 12(b)(6)." Id. at 559.

appointment).

Every Federal Court to decide cases in this area has ruled consistently with these principles — often expressly so. *See, e.g. Afran v. McGreevy,* 115 Fed. Appx. 539 (3rd Cir. 2004) (finding that the Federal Constitution did not create a right to vote in a special election for New Jersey Governor when he had announced, but not formalized, his resignation, stating "the determinative inquiry . . . is whether New Jersey law requires an election under these circumstances . . . we answer that question in the negative. Therefore, there is no violation of Plaintiffs' substantive due process rights"); *Irby v. Fitz-Hugh,* 692 F. Supp. 610, 615 (E.D. Va. 1988) (finding that plaintiff could not state a claim for violation of the 14th Amendment's guarantee of due process because "No constitutional provision prohibits the appointment of school boards," and distinguishing *Duncan v. Poythress* because there "[t]he appointment contravened state law" whereas "the act of appointing school boards does not violate any law" or "contravene any pre-existing right to vote"); *Spinka v. Brill,* 750 F. Supp. 306, 309-10 (W.D. La. 1988)  (explaining the relationship between *Rodriguez* and *Duncan:* "*Rodriguez* holds that the Constitution permits states to provide that some offices will be filled by appointment instead of elections" and, conversely, "*Duncan* forbids state officials to circumvent state laws that require them to fill offices by elections"); *Witzke v. Brickley*, 1:96 CV 602, 1996 U.S. Dist. Lexis 19880 at *5 (W.D. Mich. Nov. 6,

1996) ("Here plaintiff has not alleged that he has been deprived of his right to vote on an unequal basis. Thus, to state a claim for a violation of due process, he must allege that the community has been deprived of a right that the state previously established").

In all these cases the same rule can be found: when state law opts for an election (under given circumstances), the federal constitutions guarantees apply. But when states make the initial choice of *whether* to fill a seat by election or appointment, they enjoy "broad authority" and federal rights are implicated only where public officials "disenfranchise" voters "in violation of state law." *See Duncan,* 657 F.2d at 704; *cf. Moncier,* 570 Fed. Appx. at 559.

Thus, Plaintiffs do not have a right to vote for a position Georgia law fills by appointment. Since Georgia law authoritatively holds that an appointment was required here, there is no "burden" to be evaluated (or compared to the state's interests) — and the analysis need go no further.  The Plaintiffs cannot state a claim for relief; the complaint should be dismissed.

> b. **Even if Plaintiffs did have some right to vote under these circumstances, Georgia's appointment process passes the Anderson-Burdick test.**

Even if the Plaintiffs could show some implicated right to vote, they cannot state a claim for relief because (even on the face of the complaint) any burden imposed here by essentially delaying the opportunity to vote would be modest at

best — and more than justified by the state's interests in promptly filling vacancies and allowing appointees to demonstrate their qualifications before facing the voters in a non-partisan election.

> 1. **Any burden on the right to vote is minimal because the appointment system, at most, merely delays the opportunity to vote.**

As the Georgia Supreme Court recently re-affirmed, the Plaintiffs' suggestion that the appointment system is an "absolute restriction" on the right to vote, *Compl.* at ¶ 15, is simply false. *See Barrow,* 2020 WL 2485188 at *32-33. "[T]his approach was not intended to, and does not in fact, disenfranchise voters" nor is it "in conflict with the mandate . . . [that judges] are to be elected on a nonpartisan basis." *Id.* (citing *Perdue v. Palmour*, 600 S.E.2d. 370, 373 (Ga. 2004)).

Georgia's appointment system does not permanently disenfranchise any voter, or even render the relevant seat unelectable. In some circumstances, it may delay the election by providing (when a vacancy occurs and a new justice is appointed) that the election for the seat will be held a short while later, once the voters have had a reasonable opportunity to evaluate the appointee's performance.[8] In other circumstances, following the suggestion implicit in Plaintiff's argument

---

[8] Moreover, "[t]he people of Georgia endorsed this new approach when they ratified the 1983 Constitution." Barrow at *33.

the appointee's term should not extend beyond the now defunct term of the former office holder, would create a longer delay in having an election to choose a successor if the vacancy occurred in the first two years of a justice's six year term. The appointment process is not constitutionally inferior to an elections process (*see Barrow* at *28), and there is no valid suggestion of any invidious, illicit, or suspect conduct meant to disenfranchise voters or manipulate judicial elections.[9]

Thus, to the extent this delay represents a burden: that burden is minor, neutral, and non-discriminatory. *See Barrow* at * 34-35 ("[W]hen an incumbent Justice vacates office, any election to fill the next term of that Justice's office becomes nugatory . . . . Such elections are routinely not held, although we often do not even realize that has happened").

2. **Georgia has strong interests in promptly filling vacancies and permitting voters an opportunity to judge the appointee's performance before deciding whether to re-elect them in a non-partisan general election.**

This system, which *supports* Georgia's system of elected judges, serves

---

[9] The closest the complaint comes is paragraph 53, in which the Plaintiffs openly speculate that Justice Blackwell's resignation is somehow an attempt "to cover an otherwise naked exercise of executive power to appoint a Justice that the people of this State are entitled to elect." Neither this nor any other baseless speculation about the potential for ill-motivated resignations in future cases can help their complaint to state a claim, because "[c]onclusory allegations are not entitled to a presumption of truth, and legal conclusions must be supported by factual allegations." *Wilson v. Smith*, 576 Fed. Appx. 676, 677 (11th Cir. 2014) (citing *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

three vitally important interests. *First,* filling vacancies by appointment allows the state to promptly fill judicial vacancies, ensuring the state's highest courts are adequately staffed at all times. *Second,* creating a new term for appointees allows voters a reasonable opportunity to judge the appointee's performance before deciding whether to vote for or against their re-election. And *third,* the length of the newly created term (accounting for the "delay" of the right to vote), see Ga. Const. Art. 6. § 7 ¶ 4; O.C.G.A. § 21-2-9(b) — allows the state to run its highest ranking judicial officers in a non-partisan general election, so as to separate judges (in whom the state has a compelling interest in promoting public confidence and an appearance of impartiality), from the mine-run of political offices. *See Barrow*, at *28-29 ("the 1983 Constitution does not exempt appointed Justices from elections, but it does say expressly and specifically when an appointed Justice must face election").

These interests are all critical pieces of maintaining a stable and functional elected judiciary.

### 3. **These interests more than justify the mild burden imposed by the facts alleged here.**

Georgia's vacancy-filling system strikes a "practical balance between democracy and stability." *Barrow* at *32 (quoting *Perdue*, 600 S.E. 2d at 373). Naturally, if Plaintiffs have no right to vote for positions properly filled by appointment, there is no need for a corresponding benefit to justify the law. But

even assuming some such a right exists, essentially delaying the election for that seat until the next nonpartisan general election is a modest, practical burden to bear in exchange for the consistency and stability the vacancy-appointment system affords.

Realistically, the only times the system even arguably imposes a burden is when an appointment delays an election for the seat.[10] Nor is there any sound reason to believe that this burden is any greater here merely because the obviated election was close at hand at the time the resignation occurred. In any event, such a burden cannot and should not invalidate a neutral policy, long the norm in Georgia,[11] utilized (in one form or another) in dozens of states.[12]

Instead, the delay — to the extent it is a burden — is well justified by the need for:

---

[10] In many applications, this system does not even delay an election – since a vacancy occurring early in a six year term will actually produce an election sooner than if the appointee served out the resigning-judge's prior term. See *Barrow/Beskin* at \*35-38 (discussing various hypotheticals regarding the timing of vacancies and elections for newly created terms).

[11] See *Barrow/Beskin* at \*33 ("the appointment mechanism for initial service of Justices . . . has been the norm, not the exception, in the more than 35 years that we have lived under this Constitution").

[12] "Every state in the Eleventh Circuit uses a nominating commission for [at least] some judicial appointments," *White v. State of Ala.*, 74 F.3d 1058 (11th Cir. 1996), and approximately twenty other states fill vacancies for elected judgeships by appointment. See https://www.statecourtsguide.com/ (providing graphic representations of how each court selects and replaces judges for its highest court).

- The stability provided by an appointment system for vacancies;

- The quality-assurance provided by ensuring that, when the appointee *does* stand for re-election, the voters will have some ability to judge her qualifications and performance; and

- The respect for the judiciary promoted by running judicial officers for re-election on the general election day for *non-partisan* races.

Thus, any burden imposed on the right to vote by delaying an election for Justice Blackwell's seat is well justified by the state's interests in balancing democracy with stability.[13] *See Barrow* at *32-33 (reaffirming *Palmour*'s statement that Georgia's vacancy system represents "a practical balance between democracy and stability" and that "[a]s its drafters envisioned" it "gives the voters the right to select the holders of elective office, yet affords the appointee a sufficient opportunity to demonstrate the merit, or lack thereof, of the appointee's service.")

Moreover, the fact that the resignation here becomes effective after the election would have been held does not change the analysis. Plaintiffs seem to posit that this case is problematic because the resignation takes effect after the

---

[13] Plaintiffs appear to concede that "[t]he State may have a legitimate interest in allowing the Governor to appoint a Justice to fill an actual vacancy . . . created by a bona fide resignation," and "[i]f a new Justice is actually appointed, the state may also have an interest in allowing the appointed Justice to serve longer than the unexpired term of the vacating Justice." *Compl.* at 46; *Motion for Preliminary Injunction* at 21.

election for the new term would otherwise have been held – but there is no principled reason that should make a difference. Moving the effective date of the judge's resignation from (1) before an election is scheduled to (2) after the election would have been held (but prior to the expiration of the current term) does not change the fact that, in both cases, there is a legal vacancy triggering the appointment power. *See generally Barrow* at *35-38 (discussing the timing of the system in practice, with examples). Thus, the fact that the vacancy here would render any election moot is entirely unremarkable: An election is cancelled (or at least displaced) *every time* a justice resigns. *See id.* at 40 ("Secretaries of State appear to have routinely not conducted elections for the next term of office of resigning Justices"). Similarly, there is no more burden or delay here simply because Justice Blackwell's resignation is effective in November rather than February. In either case, a new term is created; the old one is obviated; the May 2020 election is unnecessary; and the appointee will run for a new six year term in May 2022. *Id.* at *37 (discussing this scenario). The two scenarios are indistinguishable in terms of any burdensome delay on the right to vote – and so the state needs no more justification here than it would have needed there.

Finally, the Plaintiffs' parade of horribles about potential abuse in the system bears no relationship to this case – and does nothing to change the analysis. The Plaintiffs insist that the appointment system *could* be abused either (1) to

24

invalidate the results of an election in which the incumbent or preferred candidate lost, or (2) by collusion between judges and the Governor to repeatedly appoint successors and avoid an election in perpetuity. Of course — passing over the many reasons why these are unlikely —the complaint does not allege that either of those concerns were present in this case.  *See* Footnote 13, supra. The time to bring challenges based on that particular argument is if such cases actually occur, rather than inviting this Court down a rabbit hole of hypothetical hyperbole.

Nor do any of the potential possibilities propounded by Plaintiffs say anything about the analysis of the facts in this case. Georgia's voters did not create disparities in application within the constitutionally-prescribed appointment system for vacancies that occur soon before an election would have been held; that hardly makes the system unconstitutional on these facts (even on the face of the complaint).  Regardless of whatever arguments Plaintiffs have against Georgia's longstanding vacancy-appointment system, those arguments do not make a viable constitutional claim against Georgia's system for filling judicial vacancies. Georgia's system is amply justified in light of the state's strong interests in having a workable system of ensuring that vacancies in the judicial branch are promptly filled with those appointees standing for election at a time prescribed by Georgia voters when they ratified the 1983 Constitution— balancing democracy and stability.

## **CONCLUSION**

For the foregoing reasons, the complaint should be dismissed.

Respectfully submitted,

CHRISTOPHER M. CARR     112505
Attorney General

BRYAN K. WEBB            743580
Deputy Attorney General

RUSSELL D. WILLARD      760280
Senior Assistant Attorney General

/s/Elizabeth T. Young
ELIZABETH T. YOUNG      707725
Assistant Attorney General

MILES C. SKEDSVOLD      371576
Assistant Attorney General

Georgia Department of Law
40 Capitol Square SW
Atlanta, GA  30334
eyoung@law.ga.gov
404-651-6102

Attorneys for Defendant

## Certificate of Service and of Compliance
## With L.R. 5.1(C)

I hereby certify that this filing conforms to the requirements of L.R.

5.1(C). This filing is written in 14 point Times New Roman font.

I hereby certify that on June 1, 2020, I electronically filed this Motion and

Proposed Order with the Clerk of Court using the CM/ECF system which will

automatically send e-mail notification of such filing to the following attorneys of

record:

Bruce P. Brown
BRUCE P. BROWN LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, GA 30306

This 1st day of June, 2020.

/s/Elizabeth T. Young
ELIZABETH T. YOUNG      707725
Assistant Attorney General