## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ANNE GLENN WELTNER, FRANCYS JOHNSON, and LAURA REGISTER,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, SECRETARY OF STATE, STATE OF GEORGIA,<br><br>　　　　Defendant. | Civil Action No. 1:20-cv-01407-ODE |

## PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO DISMISS
## AND REPLY ON
## BARROW V. RAFFENSPERGER

Plaintiffs Anne Glenn Weltner, Francys Johnson and Laura Register file this

Brief in Opposition to Defendant's Motion to Dismiss (Doc. 20) and Reply to

Defendants' Brief Addressing *Barrow v. Raffensperger* (Doc. 24).

## I.　　OVERVIEW OF BRIEFING AND STATUS OF THE CASE

Both of the Secretary's filings to which this brief responds relate to

Plaintiffs' Motion for a Preliminary Injunction (Doc. 7), which was filed before the

Georgia Supreme Court's decision in *Barrow*.  Plaintiffs, with leave of Court (Doc.

1

23), briefed the impact of the *Barrow* decision in a May 29, 2020, Brief  (Doc. 19), to which the Secretary responded on June 12, 2020. (Doc. 24).

On June 1, 2020, the Secretary filed a Motion to Dismiss (Doc. 20).  As the Secretary acknowledges, some of the defenses raised in the Motion to Dismiss (such as standing) have already been addressed and rejected by the Court and other issues (such as whether Plaintiffs' have stated a claim for relief) are addressed in the briefing on Plaintiffs' Motion for Preliminary Injunction, including the briefing on the *Barrow* decision.  In this Brief, Plaintiffs will address all of the issues raised and show that the Motion to Dismiss should be denied and that the Motion for Preliminary Injunction should be granted.

*Note on Date of Election.*  Separately, in response to the Court's directive (Doc. 15 at 20-21), the parties have briefed the Court on dates the election for Justice Blackwell's successor could feasibly be held.   As a result of the recent primary elections, there will be no state-wide runoff on August 11, 2020. Recognizing the challenges the Secretary and the counties would face in conducting a state-wide election on August 11, 2020, Plaintiffs agree with the Secretary that the best date for the election, should relief be granted, is the **November 3, 2020** general election date.   As to the many deadlines leading up to the date of the November 3, 2020 general election (e.g., qualifying, ballot printing,

2

UOCAVA), Plaintiffs refer the Court to the Secretary's timetable.  (*See* Doc. 21 at page 6).

*Barrow Intervention.*  Candidate John Barrow has moved to intervene (Doc. 18), which the Secretary opposes (Doc. 22).  Plaintiffs do not oppose the motion to intervene.  Since Mr. Barrow seeks the same relief (that is, election by November 3, 2020), his joinder should not delay or complicate the resolution of this case.

*Hearing.*  Plaintiffs renew their Request for a Hearing on their Motion for Preliminary Injunction (Doc. 9, which the Court denied, Doc. 15), if it would be helpful to the Court in resolving the issues presented.

## II.    RESPONSE TO MOTION TO DISMISS

The Secretary's Motion to Dismiss raises three arguments.  (*See* Doc. 20-1).

First, the Secretary argues that Count I of the Complaint, which alleged a federal constitutional claim based on the Secretary's violation of state law under *Duncan v. Poythress,* 657 F.2d 691 (5th Cir. 1981), should be dismissed in light of this Court's finding, in its May 18, 2020, Order (Doc. 15), that Plaintiffs are unlikely to prevail on that claim.   Plaintiffs do not dispute that, because of Justice Blackwell's ability under state law as to nullify any election for his successor, the Secretary's cancellation of the election does not present a *Duncan v. Poythress* claim.  Plaintiffs do not agree that the *Barrow* decision holds that Plaintiffs had no

3

right to vote on Justice Blackwell's successor to begin with; to the contrary, the Georgia Supreme Court held that Justice Blackwell's February 2020 letter of resignation itself did not give (and has not to this day given) the Governor the power to appoint Justice Blackwell's successor; instead, it is Justice Blackwell's power to nullify the election that takes from Plaintiffs the right to vote for his successor. *See infra* Part III(A).

Second, the Secretary argues that Plaintiffs do not have standing. As the Secretary acknowledges: "the Court in its Order of May 18, 2020, determined that Plaintiffs have standing to pursue their claims. Doc. 15, p. 15." (Doc. 20-1 at 8). The Secretary's argument that the *Barrow* decision warrants a reconsideration of the standing issue conflates the Article III standing issue with the merits of Plaintiffs' case and, in any event, is incorrect because Plaintiffs not only have stated a claim for relief sufficient for purposes of Article III and Rule 12(b)(6), but are likely to prevail on the merits of their claim. *See infra* Part III.

Third, the Secretary argues that Count II should be dismissed for failure to state a claim. (Doc. 20-1 at 11). The argument in Secretary's Brief in Support of his Motion to Dismiss (Doc. 20-1 at 11 – 15), is substantially the same as the Secretary's Response to Plaintiffs' Brief Addressing *Barrow* (Doc. 24), and both the discussion in both briefs will be addressed below in Part III.

4

III.   ***BARROW* AND THE UNCONSITUTIONALITY OF ALLOWING JUSTICES' TO NULLIFY THE ELECTION OF THEIR SUCCESSORS**

    A.   **This Case Squarely Raises the Constitutionality of the Georgia Law Allowing Justices to Nullify an Election for Their Successor**

In their Brief Addressing *Barrow v. Raffensperger* (Doc. 19), Plaintiffs explained that the *Barrow* decision, by rejecting the Secretary's interpretation of Georgia law, focuses this case upon the constitutionality of allowing justices to nullify an election for their successor.  In response, the Secretary contends that the right of nullification is not relevant to this case.  (Doc. 24 at 3, 10).   This argument is so wrong, and so pivotal, that it will be addressed here at length.

    The Secretary argues that a justice's ability to nullify the election for his or her successor is not relevant to this case: the nullification right is an "imagined" fact (Doc. 24 at 3), presents a scenario "unambiguously not presented here" (*id.*), is a mere "theoretical possibility" (*id.*, and *id.* at 10), and "*not what happened here."* (*id.* at 10 (emphasis by the Secretary)).  The Secretary accordingly does not address the issue: he claims that since no right to vote was nullified, the Secretary's actions did not implicate any protected constitutional rights.  Based on the premise that the right to nullify is not implicated in this case, the Secretary does not identify any legitimate governmental interest in vesting with an incumbent Supreme Court justice the unfettered discretion to determine whether to honor or set aside the

election for his or her successor.  The Secretary does not address (or deny) the fact that, under Georgia law as interpreted by *Barrow,* every election for a Supreme Court Justice in Georgia will be tentative because - up until the final day of an incumbent's six-year term - the incumbent can nullify the election by tendering his resignation.  Unable to articulate any legitimate governmental purpose for such a disenfranchising law, the Secretary has no choice but to contend that the law is not an issue in this case.

The Secretary's argument is completely contrary to the *Barrow* decision.  In *Barrow*, the Georgia Supreme Court explained at length that Justice Blackwell's ability to nullify the election when he resigned in November 2020 was *the reason, and the only reason,* for affirming the Superior Court's order denying mandamus relief.  *But for* the *inevitability* of Justice Blackwell's exercise of his right to nullify, the Secretary would have been ordered by mandamus to hold an election for his successor.

To back up one step: in defending his cancellation of the election, the Secretary argued, and the Superior Court held, that Justice Blackwell's February letter of resignation *itself* triggered the Governor's appointment power which warranted the cancellation of the election.  (Doc. 13 at 22).  The Georgia Supreme Court flatly rejected that argument, holding that the Governor's appointment power

6

will not be triggered until Justice Blackwell actually resigns and vacates his office in November 2020.  (*Barrow* at 49, Doc. 22 at 51).  The Georgia Supreme Court reasoned, however, that even though Justice Blackwell's February resignation letter itself did not justify cancelling the election, the Superior Court's decision to deny mandamus relief could be affirmed if granting mandamus relief by ordering an election would serve no practical purpose.  (*Barrow* at 50, Doc. 22 at 52).

The Court then turned to whether Justice Blackwell's November 2020 resignation was inevitable, for if it was, then such a resignation would nullify the election and, if Justice Blackwell would inevitably nullify the election in November, there was no point in ordering the Secretary by mandamus to conduct the election in May.  Here is how Justice Nahmias framed the issue:

> So the question becomes whether Justice Blackwell's office will *actually* be vacated before the end of his existing term, and that indeed is the question on which these cases turn.  Under the principles discussed above, if Justice Blackwell's office will *inevitably* be vacated on or before November 18, then the Secretary's decision to cancel the May 19 election for the next term of Justice Blackwell's office is not subject to reversal by mandamus.  . . . . On the other hand, however, if Justice Blackwell's resignation, notwithstanding its acceptance by the Governor, could be lawfully withdrawn before Justice Blackwell actually vacates his office, then no matter how likely it may be that the resignation become effective on November 18, there would be no certain that his office would be vacant before December 31 – that is, there would be no chance that he *might* complete his existing term – **and the Secretary would be required to conduct a nonpartisan election this year to fill the next standard terms in the office beginning on January 1, 2021**.

7

(*Barrow* at 49-50, Doc. 22-1 at 51-52 (italics in original; bold added)).

Justice Nahmias' analysis quoted above, and Chief Justice Melton's similar statements in his concurring opinion,[1] decimate the Secretary's attempt to characterize Justice Blackwell's right to nullify the election as a mere "theoretical possibility" or an "imagined fact."  If Justice Blackwell's nullification of the election were a mere "theoretical possibility," as the Secretary now contends, the Secretary would have lost the *Barrow* case.  Again: the Supreme Court held that, if Justice Blackwell's resignation could be withdrawn or revoked, however unlikely that might be, "the Secretary would be required to conduct a nonpartisan election this year."  (*Id.*).

The Secretary's argument is defeated not only by the Georgia Supreme Court's framing of the issue, but is contrary to the structure and content of Justice Nahmias' lengthy opinion.  Because the granting of mandamus relief depended upon *whether* Justice Blackwell's election-nullifying resignation were inevitable or

---

[1]Chief Justice Melton describes Justice Blackwell's resignation as "bilaterally irrevocable," something that "in fact and certainly" will happen "on November 18, 2020."  (*Barrow* at 73, Doc. 22-1 at 75 (Melton, C.J., concurring)).

not, Justice Nahmias devoted 16 pages of the opinion to an exegesis of the common law question of the revocability of Justice Blackwell's announced but yet ineffective resignation.  (*Barrow* at 51-66; Doc. 22-1 at 53-68) (Opening with "[t]he common law of England as of 1776 forms a backdrop . . . .").  Justice Nahmias concluded that Justice Blackwell's post-election resignation in November 2020 is inevitable (not a theoretical possibility, as the Secretary describes it) and, because it is inevitable, would have nullified the election had the election gone forward.  (*Barrow* at 66; Doc. 22-1 at 68).

The Secretary extends his flawed analysis of *Barrow* by contending that the Georgia Supreme Court held that Plaintiffs did not have the right to vote on Justice Blackwell's successor in the first place.  To the contrary: the Georgia Constitution grants Plaintiffs the right to vote for Supreme Court Justice every six-year unless and until the Governor lawfully exercises his right to appoint a justice in the event of a vacancy.  Disagreeing with the Superior Court and the Secretary, the Georgia Supreme Court held that Justice Blackwell's letter did not create such a vacancy:

> Under the Georgia Constitution and this Court's precedent, a vacancy in a public office must exist before the Governor can fill that office by appointment, and a vacancy exists only when the office is unoccupied by an incumbent.  Because Justice Blackwell continues to occupy his office, the trial court erred in concluding that his office is presently vacant; accordingly, the Governor's appointment power has not yet arisen.

9

(*Barrow* at 3, Doc. 22-1 at 5).  Thus, Plaintiffs had and have the right to vote: it is being taken away by Justice Blackwell's  November 2020 resignation.

Thus, by arguing that Plaintiffs had no right to vote, and that Justice Blackwell's right to nullify is irrelevant, the Secretary has the two holdings of *Barrow* exactly reversed.  The Georgia Supreme Court squarely held (1) Justice Blackwell's pre-election resignation letter *did not* take Plaintiffs' right to vote away by triggering the Governor's appointment power but (2) Justice Blackwell's right to nullify the election, and the inevitability of the exercise of that right, justified the denial of mandamus relief.

In sum, *but for* the Georgia law giving justices the unfettered discretion to nullify an election for his or her successor, Plaintiffs would have been entitled under Georgia law to vote for Justice Blackwell's successor.  The constitutionality of that law, therefore, could not be more squarely raised in this case.

**B.    The *Anderson-Burdick* Test Applies to the Consideration of the Constitutionality of the Georgia Law Allowing Post-Election Nullification**

The U.S. Supreme Court's *Anderson-Burdick* test is as follows:

A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the

State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze,* 460 U.S. 780 (1983)).  "When a state election law imposes only 'reasonable, nondiscriminatory restrictions' upon voters' rights, the 'State's important regulatory interests are generally sufficient' to sustain the regulation." *Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006) (quoting *Burdick,* 504 U.S. at 434).

The Secretary argues that the *Anderson-Burdick* test does not apply because citizens do not have an inherent right to vote for justices under the U.S. Constitution and whatever rights citizens do have is defined and limited by state law.  The Secretary states: "where, as here, state law provides that a seat is properly filled by appointment, no federally protectable right is implicated."  (Doc. 24 at 6).  This argument is fundamentally incorrect for several related reasons.

First, the Secretary, citing *Rodriguez v. Popular Democratic Party,* 457 U.S. 1 (1982), argues that Plaintiffs have no a "freestanding right to vote in state elections."  *Rodriguez*, and many other cases, do indeed hold that the *United States Constitution* does not grant citizens the right to vote in state elections.  Plaintiffs have never argued otherwise.  Plaintiffs' right to vote in this case, however, is

11

grounded upon the Georgia Constitution, which provides for elections of supreme

court justices every six years.

Second, and closely related, the Secretary argues that whatever state-law

right Plaintiffs may have had to vote in the election for Justice Blackwell's

successor was vaporized by Justice Blackwell's pre-election resignation.

Plaintiffs are not convinced that Plaintiffs' cause of action depends upon exactly

*when* their voting rights were taken.  But, in any event, the Secretary's argument is

incorrect as a matter of Georgia law.   All agree that the only relevant event that

would take Plaintiffs' voting rights away under Georgia law would be the

triggering of the Governor's appointment power and that power, according to

*Barrow,* "has not yet arisen" because Justice Blackwell has not resigned.  (*Barrow*

at 3, Doc. 22-1 at 5).

Third, the Secretary contradicts his own absolute position by conceding that

there are some scenarios (just not the scenario presented by this one) in which a

claim for relief would be stated.  For example, the Secretary allows that "it is

entirely possible that invidious nullification or collusion by judges would raise

some *other* constitutional problem." (Doc. 24 at 3-4 (emphasis in original)).  But

does not explain why – if Plaintiffs have no protectable federal constitutional rights

– the allegation that the nullification was invidious or collusive would alter the

constitutional analysis.  Moreover,  in this case the nullification of the election for Justice Blackwell's successor was patently collusive: according to the Supreme Court in *Barrow,* the nullification of the election would not have been effective but for Justice Blackwell's and the Governor's express irrevocable agreement that Justice Blackwell would resign on a date certain that was *after* the date of the election for his successor but *before* his term ended.  As Plaintiffs have repeatedly stated, and as the Secretary has never denied, the *only* reason for Justice Blackwell and the Governor to agree to this timing was for the purpose of cancelling, or nullifying, the election for his successor.

These undisputed facts establish collusive nullification.  As applied to this case, therefore, the law allowing such collusive nullification is unconstitutional, even by the Secretary's reckoning.   More generally, the Secretary's concession that Plaintiffs have protectable voting rights depending on the facts of the case confirms the applicability of the *Anderson-Burdick* test, which by its terms applies to any state election law, like this one, that burdens the exercise of the right to vote.

Fourth, at the heart of the Secretary's argument is the notion that so long as a state election law does not discriminate against a subset of voters that it is immune from constitutional review.  (Doc. 20-1 at 13-14).  To the contrary: the fact that the law burdens all voters equally may reduce the level of scrutiny, but it does not

13

relieve the State of establishing at least a "reasonable" basis for the law.  *Burdick,*
504 U.S. at 434 (if the state election law imposes only  "reasonable,
nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of
voters, "the State's important regulatory interests are generally sufficient to justify"
the restrictions); *see also Wexler*, 452 F.3d at 1233.[2]

Finally, none of the cases cited by the Secretary in either brief support the
Secretary's argument that a law giving a justice the power to nullify an election
evades constitutional scrutiny under *Anderson-Burdick*.   In *Rodriguez v. Popular
Democratic Party,* 457 U.S. 1 (1982), the Supreme Court rejected a challenge to a
Puerto Rico statute vesting in a political party the power to fill an interim vacancy
in the Puerto Rico Legislature.  The Supreme Court in *Rodriguez* initially rejected
the voters' "basic assertion of an absolute constitutional right to elect
representatives to a state or commonwealth legislature."[3] *Id.* at 11 n. 10.   The

_____

[2]In *Wexler*, the Eleventh Circuit first affirmed the denial of the plaintiffs' equal protection claims
and then turned to its due process claims, holding: "whatever burden, if any, Florida's manual
recount procedures place on voters, that burden is justified by the important regulatory interests
outlined above. Therefore, we hold that Florida's manual recount procedures do not deprive
voters of due process."  In this case, by contrast, the Secretary has not identified any state
interest.  *See infra* Part III(C)(2).

[3] The Secretary cites *Sailors v. Board of Educ,* 387 U.S. 105, 108 (1967), for the same
proposition.  (Doc. 20-1 at 10).  In this case, however, Plaintiffs do not claim that the Governor
does not have the right to appoint justices to fill a vacancy.  Plaintiffs instead challenge the
feature of Georgia law, confirmed by *Barrow,* that allows a justice to nullify the election for his

Court then observed that the Puerto Rico statute did "not restrict access to the electoral process or afford unequal treatment to different classes of voters or political parties." *Id.* at 11.  If the Secretary's argument in this case were correct, the Supreme Court's analysis would have ended there: since citizens do not have a federal constitutional right to vote for their state legislators, and the Puerto Rico election law does not discriminate among voters, any consideration of Puerto Rico's governmental interest would be irrelevant.  The Supreme Court went on, however, to discuss at length the legitimacy, reasonability and importance of the challenged law.  "Moreover, the interim appointment system plainly serves the legitimate purpose of ensuring that vacancies are filled promptly, without the expense and inconvenience of a special election."  *Id.* at 12.  Further, the Supreme Court agreed that delegating the appointment power to a political party "was a legitimate mechanism servicing to protect the mandate of the preceding election." *Id.*  "It was thus not unreasonable for the Puerto Rico Legislature, in establishing an appointment system for filling legislative vacancies, to make provision for continuity of party representation."  *Id.* As discussed further below, in this case there is no justification for giving justices the absolute power to nullify elections.

_____

or her successor by either agreeing irrevocably before the election to resign after the election (as here) or resigning after the election without agreeing to do so beforehand.

The Secretary relies heavily on a Sixth Circuit decision, *Moncier v. Haslam*, 570 F. App'x 553, 559 (6th Cir. 2014).  (Doc. 20-1 at 15-16).  *Moncier* does not support the Secretary's position, for two reasons.  First, *Moncier* addressed a completely different claim.  Moncier was a serial litigant.  (Doc. 20-1 at 16).  Moncier's complaint in the Sixth Circuit case was that "Tennessee voters cannot, in all instances, elect the judges of the state's appellate courts."  570 F. App'x at 558.  In this case, Plaintiffs make no such claim; Plaintiff do not challenge the right of the Governor to make appointments in the event of a vacancy, even an appointment to fill a vacancy created after the election for the incumbent's successor.  Plaintiffs' claim here is narrowly focused on the ability of a justice, by resigning after an election, to nullify the results of that election.  Second, the *Moncier* opinion distinguished *Anderson* and *Burdick*  by noting that those cases "presupposed that state law required an election for a particular office in the first place."  *Id.* at 559.  Here, under the Georgia Constitution, state law required an election for Justice Blackwell's successor "in the first place."

In each brief, the Secretary cites four other cases from other jurisdictions, none of which support the granting of the Motion to Dismiss or the denial of the

16

Motion for Preliminary Injunction. (Doc. 20-1 at 17; Doc. 24 at 9 n. 5).[4]   Together these cases, and dozens of others, show how fact-bound this area of the law is because of the variety of state election laws.   Thus, as the U.S. Supreme Court has repeatedly made clear, each law must be evaluated on a case-by-case basis to determine if the burden on the right to vote is justified by a sufficient state interest.

---

[4] In *Afran v. McGreevey*, 115 F. App'x 539, 549 (3d Cir. 2004), the court held that, under New Jersey law, there was no vacancy in the office of the governor and that the plaintiffs accordingly were not entitled to a special election.   "Absent a state law requirement that such an election be held, plaintiffs have failed to state a claim under § 1983 for violation of their Fourteenth Amendment rights to substantive due process."   *Id.* at 548-549.   *Afran* did not address the issue raised in this case, that is, whether a state law giving a justice the unfettered discretion to cancel or nullify the election of his or her successor passes constitutional muster.

Similarly, in *Irby v. Fitz-Hugh*, 692 F. Supp. 610, 616 (E.D. Va. 1988), *aff'd sub nom. Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352 (4th Cir. 1989), the District Court held that the act of appointing school boards did not violate any law or contravene a pre-existing right to vote. On appeal, the Fourth Circuit noted that the plaintiffs raised no arguments in support of their due process voting claim.   *Id.* at 1356-57.

*Spinka v. Brill,* 750 F. Supp. 306, 309 (N.D. Ill. 1990), is clear support for Plaintiffs' position. The District Court held: "When state law provides, as it does here, that a certain office will be filled by election, the holding of *Rodriguez* does not apply."   The District Court denied relief, however, because plaintiffs had failed to avail themselves of alternative means of calling for an election.

The Secretary's citation to *Witzke v. Brickley,* 1:96 CV 602, 1996 U.S. Dist. Lexis 19880 (W.D. Mich. Nov. 6, 1996), illustrates the paucity of support for his position.   In *Witzke,* the plaintiff, proceeding in forma pauperis, alleged that the County's reassignment of trial judges within the county violated the plaintiffs' right to vote.   The District Court granted the defendants' motion for summary judgment because there was no allegation of any improper election or appointment of any judge.   The case was so lacking in merit the District Court denied plaintiff the right to proceed in forma pauperis on appeal.

17

*Storer v. Brown,* 415 U.S. 724, 730 (1974); *Crawford v. Marion Cty. Election Bd.,* 553 U.S. 181, 205 (2008).

### C.   Application of *Anderson-Burdick*

Since the challenged law burdens Plaintiffs' right to vote, under *Anderson-Burdick* two questions remain: first, what is the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments," *Burdick,* 504 U.S. at 438; second, what is the "precise interest put forward by the State as justifications for the burden imposed by its rule, taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 438 (quoting *Anderson v. Celebrezze,* 460 U.S. 780 (1983)).

### 1.   *Character and Magnitude of the Injury to Plaintiffs' Rights*

As Plaintiff explained in previous briefs, unless injunctive relief is granted, Plaintiffs' right to vote in the election for the justice who will fill Justice Blackwell's seat in 2021 and 2022 will be taken away entirely.  This identical injury will occur every time a justice exercises his right to nullify an election. Other than reiterating its incorrect argument that Plaintiffs had no right to vote in the first place, the Secretary has no comprehensible answer.  (*See* Doc. 20-1 at 19 to 20).  The Secretary also does not address Plaintiffs' argument that, under *Barrow,* there may never be an election for what is now Justice Blackwell's seat.

18

The appointed justice could do exactly what Justice Blackwell has done here: resign just before his or her term expires and give the Governor another appointment.  The Secretary also does not deny that another severe – and disturbing - burden that the law places upon Plaintiffs' First and Fourteenth Amendment rights is that it renders *every* election tentative, subject to the post-election discretion of the incumbent justice.

       2.    *No Governmental Interest in Allowing a Justice to Nullify an Election*

Despite having three briefs to articulate a sensible state interest in allowing a justice to nullify an election, the Secretary has utterly failed to do so.  The first asserted interest is that "filling vacancies by appointment allows the state to promptly fill vacancies, ensuring that the state's highest courts are adequately staffed at all times."  (Doc. 13 at 27, 28; *see also* Doc. 20-1 at 21 (same); Doc. 24 at 11 (same)).  This interest has nothing to do with this case.  The issue is not the Governor's responsibility to fill vacancies promptly, but whether a post-election appointment should nullify the results of the election.

The second asserted interest is that "creating a new term for appointees allows voters a reasonable opportunity to judge the appointee's performance before deciding whether to vote for or against their re-election."  (Doc. 13 at 27, 28; *see*

19

*also* Doc. 20-1 at 21 (same); Doc. 24 at 11 (same)).  This asserted interest at least

is relevant to the post-election nullification law, but the Secretary has no response

to Plaintiffs' argument (Doc. 19 at 10-11) that it makes no sense to allow a popular

election to be nullified just to give the appointed justice a chance to develop a track

record before his or her own subsequent election two years later, *which itself can*

*be nullified by another post-election resignation.*  Whatever interest the State has is

in giving voters more information to make an informed decision before voting is

completely overtaken by a law that allows the repeated nullification of their vote.

The third interest that the Secretary identifies is that it promotes "respect for

the judiciary by running judicial officers for reelection on the general election day

for *non-partisan* races."  (Doc. 20-1 at 23; Doc. 13 at 27, 28; Doc. 24 at 11).  This

is nonsense on stilts.  Initially, the Secretary has no answer to Plaintiffs' argument

(Doc. 19 at 11-12) that this interest has nothing to do with this case.  The Georgia

law allowing post-election nullification of popular elections is not necessary to

preserve whatever interest there is having non-partisan elections.

More fundamentally, the argument that the law allowing a single justice to

nullify an election – even his own election – promotes "respect for the judiciary" is

utterly absurd.  The Secretary repeatedly extols the state's interest in promoting

"respect for the judiciary" (Doc. 13 at 28) and the state's "compelling interest in

20

promoting public confidence and an appearance of impartiality." (Doc. 13 at 27).

No credible argument that can be made that giving a sitting justice the power to

nullify the election for his or her successor by resigning after the election promotes

"respect for the judiciary," gives the "appearance of impartiality," or enhances the

"non-partisan" character of the position.    Here again, the Secretary has no

response to Plaintiffs' argument (Doc. 19 at 12-14) that allowing a justice to

nullify an election will completely undermine any respect for the judiciary.

In a prior brief, Plaintiffs gave the example of the campaign between Justice

Bethel, the incumbent, and challenge Elizabeth Beskin. (Doc. 19 at 13). *See*

Opinion, Jim Galloway, "In Judicial Races, it is Now Vital that Your Opponent

Does Not Quit in a Huff" (attached as Exhibit A). Justice Bethel's opponent in the

race for his position demanded that Justice Bethel pledge to not exercise his right

to nullify the election results. Justice Bethel characterized the demand as a "stunt,"

but nevertheless made such a pledge. Justice Bethel, of course, did the right thing:

the power conferred by the law allowing post-election nullification should never be

exercised for it is undemocratic and promotes a lack of respect in the judiciary.

Justice Bethel's actions confirm that this law does not enhance respect for the

judiciary; by giving a sitting justice the power to veto a popular election, the law

both demeans the judiciary and defeats democracy.  The Secretary has never

21

addressed the Bethel example or explained how the law enhances respect for the judiciary.

In a last-ditch effort to explain the state interest in allowing the incumbent to nullify the election for his or her successor, the Secretary cites the *Barrow* decision.  With all due respect, the Secretary's citation to the *Barrow* decision on this point is not accurate or fair, and contains inadvertent punctuation omissions that materially alter the meaning of the quotation.  In his Brief, the Secretary states:

> Finally, *Barrow* only re-affirms that those interests easily justify the burden imposed here.  As the Georgia Supreme Court put it: "this approach was not intended to, and *does not in fact, disenfranchise voters*," nor is it "in conflict with the mandate . . . [that judges] are to be elected on a nonpartisan basis."  *Barrow,* at *32-33 (citing *Perdue v. Palmour,* 600 S.E.2d 370, 373 (Ga. 2004)) (emphasis added).

(Doc. 24 at 11).  But the Supreme Court was not "citing" *Perdue,* it was *quoting* the *Perdue* case, and the *Perdue* case's statement that the approach did not "disenfranchise voters" was not referring to post-election nullification but pre-election cancellation of an election triggered by an *actual pre-election* vacancy that empowered the Governor to appoint the successor.  278 Ga. at 218.

In fact, nowhere does the *Barrow* opinion discuss the governmental interest in allowing a justice to nullify an election.  The majority opinion goes out of its way to not do so.  Justice Nahmias describes multiple scenarios involving the

22

timing of various resignations, but none of the hypothetical scenarios involve a justice resigning after the date for the election of his or her successor.  (*See* Doc. 21-1 at 37-40).  And, even with respect to the scenarios in which a justice resigns after the qualifying period for the election, Justice Nahmias does not describe any state interest in allowing such a resignation to nullify the ongoing election.  (*Id.*).

To be fair, the *Barrow* majority, and Chief Justice Melton's concurring opinion, do not purport to assess the reasonableness or merit of Georgia law. "[P]olicy arguments are beside the point."  (*Barrow* at 69, Doc. 22-1 at 69).  Policy arguments may indeed be beside the point with respect to the meaning of the law, but the absence of any policy reason for the law leaves the state unable to articulate "the precise interest" that justifies the burden imposed by its rule.  *Burdick,* 504 U.S. at 438.

There is no argument – in *Barrow* or in any of the Secretary's briefs – that post-election nullification was intended or anticipated by anyone when the 1983 Constitution was ratified.  One reason is this: at the time the 1983 Constitution was ratified, the duration of the post-election period in which a justice might resign was only two months; any right of nullification would have to be exercised in the 71st or 72nd month of the justice's 72-month term.  In 2011, Georgia statutes were amended to make the nonpartisan general election coincide with the general

23

primary election, which typically occurs in May of each even-numbered year.
"The post-2011 timetable can leave a much longer period between the nonpartisan
election (usually in May) and the beginning of the standard term of a Justice's
office for which the election is held (on the next January 1) – more than seven
months if there is no runoff, as opposed to less than two months under the prior
timetable, when Justices were elected in November."  (*Barrow* at 23 n. 7, Doc. 22-
1 at 25).  There further is no evidence, or argument, that the General Assembly's
purpose in moving the election back to May was to give justices more time to
nullify the election before their term expired.

In sum, there is no good reason to allow justices to nullify election results,
much less interests of compelling importance.  Instead, by giving this power to
sitting justices, the law is antithetical to the public interest because it promotes
"purely personal and arbitrary power."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370
(1886).

To summarize:

1.     Under Georgia law, Justice Blackwell's February 26, 2020,
announcement that he intended to resign in November did not create a vacancy
triggering the Governor's appointment power, *Barrow, supra*;

24

2.    The Georgia law that would allow Justice Blackwell's November 18, 2020 resignation to nullify the results of an election for his successor is unconstitutional because the severe burden it places upon Plaintiffs' First and Fourteenth Amendment rights is not justified by any legitimate governmental interest;

3.    To remedy this violation of Plaintiffs' constitutional rights, the Secretary should be ordered to conduct the non-partisan election for Justice Blackwell's successor on November 3, 2020.

For the foregoing reasons, the Defendant's' Motion to Dismiss should be denied and the Plaintiffs' Motion for Preliminary Injunction should be granted.

Respectfully submitted this 15ʰ day of June, 2020.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700
*Attorney for Plaintiffs*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Complaint has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
Attorney for Plaintiffs
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 15, 2020,  a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

<u>*/s/ Bruce P. Brown*</u>
Bruce P. Brown

27

E

X

H

I

B

I

T

A



# AJC
## Atlanta. News. Now.

News    Georgia Politics    County By County    Coronavirus    Things To Do    Life    Sports    ePaper

  Log In

Support Local Journalism. **Subscribe today for 99¢.**



Opinion: In judicial races, it's now vital that your rival doesn't quit in a huff



Photo: Bob Andres/bandres@ajc.com

POLITICAL INSIDER  |  May 26, 2020

By Jim Galloway

**Beth Beskin, an Atlanta attorney** and former GOP state lawmaker, is running against incumbent Charlie Bethel for a seat on the Georgia Supreme Court. The election is June 9.

Several days ago, she issued a most peculiar challenge to her rival. Beskin wanted him to promise not to quit his job – once she beats him.

"This is an absurd stunt," said a spokeswoman for Bethel, who was appointed to the high court in 2018 and now is seeking election to a full six-year term.

Even so, the campaign aide promised that Bethel would not resign in a huff, should the occasion arise – and added that her candidate would also "do his best not to die" before midnight on Dec. 31, when his current term expires.

A stunt it may have been. It's hard to attract attention in any judicial race, especially during a pandemic. Yet Beskin's challenge was anything but absurd.

The Georgia Supreme Court had made sure of that only a day earlier, when it offered up a blueprint for the vast expansion of a governor's power to shape the state's legal system — and to trash the ballots you cast in judicial contests. Your vote in other contests could be affected, too.

"Under this ruling, I could win my election against Justice Bethel on June 9, and that result could be completely erased if he then chose to resign and allow Governor Kemp to appoint his successor," Beskin told a reporter.

We have written before about the Case of the Vanished Supreme Court Contest. On Feb. 25, state Supreme Court Justice Keith Blackwell, whose term expires at the end of this year, submitted a letter of resignation to Gov. Brian Kemp, effective Nov. 18 – 43 days before he leaves office.

The governor accepted the resignation, also in writing, the same day. Three days later, their agreement became public.

The next week, a pair of political veterans showed up at the state Capitol to sign up for Blackwell's seat — Beskin, who had represented a portion of Buckhead, and former Georgia congressman John Barrow, a Democrat.

Both were turned away by Secretary of State Brad Raffensperger. The seat would be filled through an appointment by the governor, the two were informed. And the election for that seat would be moved to 2022.

Beskin and Barrow filed separate lawsuits in Fulton County Superior Court, demanding that the Supreme Court contest be added to the ballot. "If [a seat] is not vacant before the election, I think the election needs to happen," Beskin told me Monday. (When she entered the race for Bethel's seat, she reserved the right to switch to the Blackwell contest, if that race were revived.)

Fair Fight Action, the voting rights group founded by Stacey Abrams, plus the Georgia NAACP and the Urban League of Greater Atlanta weighed in on Barrow's behalf with an amicus brief.

The state Constitution mandates that judges, including those on the Georgia Supreme Court, "shall" be elected. In practice, few judges are elected without being appointed. The resulting racial disparity is obvious. From 2003 through 2018, Govs. Sonny Perdue and Nathan Deal made 198 judicial appointments. Only 6.33% of Perdue's appointments were racial or ethnic minorities. Deal's amounted to 16.81%.

Nearly 40% of Georgia's population are people of color.

Two weeks ago, the legal protests by Barrow and Beskin were dismissed by the Georgia Supreme Court. Six of nine justices recused themselves, including Bethel. Five were replaced by Superior Court judges.



Photo: Bob Andres/bandres@ajc.com

Because the agreement between Blackwell and Kemp amounted to a non-rescindable contract, the future vacancy is to be treated as already existing, the majority ruled. And so the appointment goes to the governor.

Justice David Nahmias wrote the opinion, which also offered this hypothetical: Suppose Justice Blackwell had not written a letter of resignation, and voters had selected a replacement for him on June 9.

If Blackwell waited until Nov. 18 – or any day prior to the end of his term – the governor would still be given the seat to fill. "Whoever won the…election would have won nothing of legal value, as he or she would have no term of office to fill," the justices ruled.

In other words, your vote would be trashed. It would have no legal value.

In a two-justice dissent, Ocmulgee Circuit Superior Court Judge Brenda Trammell noted the conflict built into the state Constitution, between the governor's power of appointment and

Case 1:20-cv-01407-ODE Document 25 Filed 06/15/20 Page 33 of 35

the voters' right to elect their judges.

"For the first time since the enactment of this constitutional provision, the majority is ruling that the appointment power of the Governor trumps the voting power of the public," Trammell wrote. "Let me be clear. This ruling means that even were the election to go forward and a winner be declared, the appointee defeats the electee."

Candidates for judicial office have been put on notice. "Everybody running for office should be rightly worried that the election that they're investing so much time and effort and treasure in can evaporate if the incumbent resigns," Beskin said.

But more than judicial races may be affected by the ruling logic of the state Supreme Court. In 2018, the Legislature passed a measure that subjects district attorneys, who are elected on a partisan basis, to much the same replacement process as non-partisan judges.

This winter, the district attorney for the judicial circuit that covers Athens-Clarke County and Oconee County decided to resign effective Feb. 29 rather than run for re-election. Had the governor immediately filled that vacancy, the contest would likely have concluded on Nov. 3. But now, if a vacant district attorney slot is filled by the governor less than six months before an election, the election disappears – and is moved forward two years.

Governor Kemp sat on the appointment. As of May 3, he still had not filled the Athens spot, and so the election disappeared. (A Democratic candidate, Deborah Gonzalez, has filed suit in federal court.)

Last week, Kemp filled a vacant Superior Court seat in the Alcovy Circuit, which covers Newton and Walton counties. The governor appointed District Attorney Layla Zon, a graduate of Liberty University and the Georgia State University College of Law.

Zon had been facing re-election. A Republican, she had both primary and Democratic opposition. Walton County went strong for Donald Trump in 2016, but Hillary Clinton won Newton County. A Democrat has a fighting chance in November.

But when we inquired whether that race for district attorney would disappear, Newton County election director Angela Mantle advised us to call the secretary of state's office. We did so, and are still waiting for an answer.

But wait, there's more. Consider Fulton County District Attorney Paul Howard, who is facing re-election — and quite a number of accusations.

Three past or present female employees have sued Howard, alleging harassment or discrimination. The GBI is investigating his use of a nonprofit to funnel at least $140,000 in city of Atlanta funds to supplement his salary.

The Democratic district attorney has not been charged with any crime and has denied any and all wrongdoing, but let's suppose that he leaves office before the Nov. 3 election – whether voluntarily or not. If he does, the governor could appoint his replacement, perhaps a Republican, and the election would vanish until 2022.

"I've been looking at that issue. Would the governor take that seat and have it for two years?" wondered Fani Willis, Howard's former chief deputy, who is running against him. She's beating her old boss in fundraising, and has collected endorsements from a long list of current Democratic office-holders.

The Fulton County district attorney, because he has jurisdiction over doings in the state Capitol and so many corporate headquarters, is probably the second most powerful law enforcement officer in the entire state — second only to the attorney general of Georgia, Willis posited in an interview.

"The governor has definitely made some diverse appointments, more so than other Republican governors. But he has not done it in Fulton County," Willis said. "And Fulton County, quite frankly, is the most important county."

It is an odd thing to write of elections as if they were — or might soon be — missing children on milk cartons. But that appears to be where we're headed.

---

Support real journalism. Support local journalism. Subscribe to The Atlanta Journal-Constitution today. See offers.

---

Download the new AJC app. More local news, more breaking news and in-depth journalism.

*AJC.com.* Atlanta. News. Now.

---

With the largest team in the state, the AJC reports what's really going on with your tax dollars and your elected officials. Subscribe today. Visit the AJC's Georgia Navigator for the latest in Georgia politics.

## About the Author



Jim Galloway

Jim Galloway is a three-decade veteran of The Atlanta Journal-Constitution who writes the Political Insider blog and column.



---