IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL 15 2020

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

ANNE GLENN WELTNER, FRANCYS
JOHNSON, and LAURA REGISTER,

        Plaintiffs,

v.

BRAD RAFFENSPERGER, SECRETARY
OF STATE, STATE OF GEORGIA,

        Defendant.

CIVIL ACTION NO.
1:20-cv-01407-ODE

ORDER

This action is before the Court on Plaintiffs' Motion for Preliminary Injunction [Doc. 7] and Defendant's Motion to Dismiss [Doc. 20]. For the reasons provided below, the Court DENIES Plaintiffs' Motion for Preliminary Injunction and GRANTS Defendant's Motion to Dismiss.

I.    **FACTUAL BACKGROUND**

Justice Keith R. Blackwell currently serves as an Associate Justice of the Supreme Court of Georgia [Doc. 1 at 6 ¶ 12]. His current term began on January 1, 2015 and was scheduled to end on December 31, 2020 [Id.]. However, on February 26, 2020, Justice Blackwell sent a letter to Governor Brian Kemp tendering his resignation, effective November 18, 2020 [Id. at 7 ¶ 14]. Justice Blackwell chose the November 18, 2020 date because it was "at the end of the August Term of the Supreme Court," and was "a date sufficiently distant to avoid--in light of the imminent retirement of Justice Robert Benham--the disruption in the important work of the Court that otherwise might follow after the departure of two sitting Justices and the appointment of two new

Justices close in time" [Doc. 31 at 11-12].  Governor Kemp accepted Justice Blackwell's resignation that same day [Doc. 1 at 7 ¶ 15].

Defendant Brad Raffensperger ("Secretary Raffensperger" or "Defendant") is the Georgia Secretary of State [Id. at 5 ¶ 9]. Secretary Raffensperger originally scheduled the nonpartisan general election for Justice Blackwell's position on the Georgia Supreme Court for May 19, 2020 [Id. at 7 ¶ 13].  However, on March 1, 2020, Governor Kemp notified Secretary Raffensperger that he intended to fill Justice Blackwell's office by appointment on the ground that Justice Blackwell's resignation, once accepted, created a vacancy that could be filled by appointment.  Following that notice, Secretary Raffensperger cancelled candidate qualifying for the May 19, 2020 election and directed the employees at the Secretary of State's office to decline to accept any tendered documents and fees [Id. at 9 ¶ 19].

The plaintiffs in this action are Anne Glenn Weltner ("Weltner"), Francys Johnson ("Johnson"), and Laura Register ("Register") (collectively, "Plaintiffs") [Id. at 4-5 ¶¶ 6-8]. Plaintiffs are registered electors of the state of Georgia [Id.]. Weltner resides in Fulton County [Id. at 4 ¶ 6], Johnson resides in Bulloch County [Id. at 5 ¶ 7], and Register resides in Grady County [Id. at 5 ¶ 8].  Had Secretary Raffensperger not cancelled the election for Justice Blackwell's seat, Plaintiffs claim they would have voted in the May 19, 2020 election--now scheduled for June 9, 2020--for their choice of successor [Id. at 9 ¶ 20].

Plaintiffs filed this lawsuit under 42 U.S.C. § 1983 on March 31, 2020. Plaintiffs argue that the cancellation of the election for Justice Blackwell's seat violates Federal law under two alternative theories. Plaintiffs first argue that Secretary Raffensperger's action violates state law, and therefore the Due Process Clause of the Fourteenth Amendment of the United States Constitution, under Duncan v. Poythress, 657 F.2d 691 (5th Cir. 1981).[1] Plaintiffs alternatively argue that even if Georgia law allowed Secretary Raffensperger's actions, Georgia law itself violates the Due Process Clause because there is no legitimate, much less a compelling, justification for the state's deprivation of their right to vote.

On April 24, 2020, Plaintiffs filed a Motion for Preliminary Injunction [Doc. 7], in which they asked the Court to order Secretary Raffensperger to reinstate the election for Justice Blackwell's seat. On June 1, 2020, Secretary Raffensperger filed a Motion to Dismiss [Doc. 20], arguing first that the Court lacks jurisdiction to hear the case, or, in the alternative, that Plaintiffs' complaint fails to state a claim upon which relief can be granted.

## II.  PROCEDURAL BACKGROUND

At least two candidates, John Barrow ("Barrow") and Elizabeth Beskin ("Beskin"), timely tendered applications, the required notices, and the qualification fees for Justice Blackwell's seat [Id. at 9 ¶ 19]. However, Secretary

---

[1]Decisions of the Fifth Circuit handed down prior to close of business on September 30, 1981 are binding on this Court. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

Raffensperger's staff refused to accept their qualifying documents and fees. After being turned away by the Secretary's office, Barrow and Beskin each filed a petition for mandamus in the Fulton County Superior Court, seeking to compel the Secretary to hold the election for Justice Blackwell's seat and to allow them to qualify for the election. Barrow and Beskin argued that Secretary Raffensperger violated state election law by cancelling the election for Justice Blackwell's seat. Because Justice Blackwell is not leaving office until November 18, 2020, they argued there is currently no vacancy that the Governor can fill by appointment before the May 19, 2020 election, and therefore Secretary Raffensperger had no discretion to cancel a required election. Beskin also brought a claim under 42 U.S.C. § 1983, arguing that the Secretary's decision violated her right and privilege to qualify as a candidate for office and to vote for the candidate of her choice under the United States Constitution.[2]

The Fulton County Superior Court denied both petitions on March 16, 2020, finding that Secretary Raffensperger could not be compelled by mandamus to hold the May 19, 2020 election for Justice Blackwell's seat. See Barrow v. Raffensperger, Civil Action No. 2020CV334031; Beskin v. Raffensperger, Civil Action No. 2020CV333983. The court summarized its decision as follows:

> This Court finds that, under the express language of the Georgia Constitution and O.C.G.A. § 45-5-1, a vacancy existed for Justice Blackwell's seat as of

---

[2]Like Count I of Plaintiffs' complaint, discussed *infra* in Section IV.A, Beskin's federal claim relied on Duncan v. Poythress, 657 F.2d 691 (5th Cir. 1981).

> February 26, 2020 and once Governor Kemp notified the Secretary of State of Governor Kemp's decision to fill the seat via appointment, Secretary Raffensperger no longer was under a statutory legal duty to hold qualifications for Justice Blackwell's seat.

Barrow, Civil Action No. 2020CV334031, at 10.  The court also denied Beskin's federal claims.

The Georgia Supreme Court affirmed the lower court's decision on May 14, 2020.  See Barrow v. Raffensperger, 842 S.E.2d 884, 907 (Ga. 2020).  The court disagreed with the lower court's reasoning but nonetheless concluded that Secretary Raffensperger's actions did not violate state election law and that he could not be compelled by mandamus to hold the May 19, 2020 election for Justice Blackwell's seat.  The court found that

> [u]nder the Georgia Constitution and this Court's precedent, a vacancy in a public office must exist before the Governor can fill that office by appointment, and a vacancy exists only when the office is unoccupied by an incumbent.  Because Justice Blackwell continues to occupy his office, the trial court erred in concluding that his office is presently vacant; accordingly, the Governor's appointment power has not yet arisen.

Barrow, 842 S.E.2d at 887.

The court continued, however, stating that Paragraphs III and IV of the Georgia Constitution's judicial selection section "make it clear that a judge appointed to an elective office does not inherit and serve out the remainder of his or her predecessor's term of office."  Id. at 893-94.  Rather, that unexpired term is eliminated when the incumbent judge vacates the office.  Id.; see also Heiskell v. Roberts, 295 Ga. 795, 799 (2014); Perdue v. Palmour, 278 Ga. 217, 221 (2004) (Carley, J., concurring).  Therefore,

5

> [u]nlike earlier Georgia Constitutions . . . our current Constitution, which took effect in 1983, clearly provides that when an incumbent Justice vacates his office before the end of his term, his existing term of office is eliminated, and the successor Justice appointed by the Governor serves a new, shortened term that is unrelated to the previous incumbent's term.

Barrow, 842 S.E.2d at 887.

> Consequently,

> even if Justice Blackwell's office is not vacant yet, if his accepted resignation will undoubtedly create a vacancy in his office on November 18, his term of office will go with him, and the next six-year term of his office that would begin on January 1, 2021, will never exist. The next election will be in 2022, for the next term of the *appointed* Justice's office; the May 19, 2020, election for the next term of Justice Blackwell's office will be legally meaningless (as well as misleading to voters and the public); and the Secretary cannot be compelled by mandamus to conduct a legally nugatory election.

Id. at 887-88.

Barrow argued before the Georgia Supreme Court that the Governor's power to appoint judges is an exception to the general rule that Justices are to be elected. Id. at 894. The court, however, disagreed. It determined that the constitutional provisions calling for judicial elections work in tandem with those authorizing gubernatorial appointment, with neither serving as a constitutionally inferior alternative to the other. Id.

> Paragraph I requires an election for a standard six-year term for a Justice, whenever such a term will exist; when a Justice's office is vacated before the end of his or her term, Paragraph III says that the Governor appoints a Justice to fill the office, and Paragraph IV says that the appointed Justice will serve a different, shorter term, at the end of which there will be an election if the Justice wishes to continue serving.

Id.

6

The court stressed the importance of Paragraph IV's definition of the initial period of service for judges appointed to elected office, because "it was a significant change from prior Georgia Constitutions, under which an appointed judge simply served out all or part of the unexpired term of the prior incumbent."   Id. at 895; see also Heiskell, 295 Ga. at 799 (explaining that "[u]nlike the prior constitutional provisions . . . Art. VI, Sec. VII, Par. IV of the Georgia Constitution of 1983 eliminates the unexpired term of the vacant office," so "there is no longer such a thing as an appointment to serve out the 'unexpired term' of an appellate, superior, or state court judge") (citation omitted).

The Georgia Supreme Court therefore held that when an incumbent Justice vacates his or her office before the end of the term, the incumbent's unexpired term disappears with him or her, along with any future terms associated with that incumbent.  Any election for that position therefore becomes legally nugatory, as there will be no such term of office for the candidate who wins the election to serve.  Because a vacancy in an incumbent Justice's office eliminates the need under the Georgia Constitution for an election for the next term, the Secretary of State has no legal duty to conduct such an election and cannot be compelled by mandamus to do so.[3]

_____

[3]The parallel state court proceedings also addressed whether Justice Blackwell's prospective resignation, once accepted by the Governor, may be withdrawn.  The Georgia Supreme Court concluded that Georgia law does not allow such a withdrawal.  Therefore, once Justice Blackwell unequivocally resigned from office, and Governor Kemp unequivocally accepted that resignation, Justice Blackwell's resignation could not be withdrawn, and his vacancy--

## III. JUDICIAL ELECTION LAW IN GEORGIA

The Court begins with a brief overview of the relevant portions of the current Georgia Constitution.[4]   Article II, Section I, Paragraph II of the Georgia Constitution states:

> Every person who is a citizen of the United States and a resident of Georgia as defined by law, who is at least 18 years of age and not disenfranchised by this article, and who meets minimum residency requirements as provided by law shall be entitled to vote at any election by the people.

Ga. Const. Art. II, Sec. I, Par. II; see also Democratic Party of Ga., Inc. v. Perdue, 288 Ga. 720, 724 (2011).

With respect to judicial elections, the Constitution of the State of Georgia provides for a system whereby Justices of the Supreme Court fill their offices in two different ways: by election and by gubernatorial appointment.  Brooks v. Ga. State Bd. of Elections, 59 F.3d 1114, 116 n.1 (11th Cir. 1995) ("The Georgia judicial electoral system involves aspects of both election and appointment.").   The pertinent constitutional provisions are found in Section VII ("Selection, Term, Compensation, and Discipline of Judges") of Article VI ("Judicial Branch").   Paragraph I(a) states that Justices of the Supreme Court are elected for a term of six years in nonpartisan judicial elections.  Ga. Const. Art. VI, Sec. VII, Par. I(a).  Thus, all

---

though prospective--became inevitable.  The court also rejected Beskin's federal claim under Duncan, finding it was derivative of her claim that the Secretary violated state election law.

[4]Georgia's current Constitution was ratified and took effect in 1983.  Barrow v. Raffensperger, 842 S.E.2d 884, 887 (Ga. 2020).

Justices who are elected to fill their offices serve a term of six years, beginning on January 1 of the year following their election.  The nonpartisan election for that term coincides with the general primary election in the year at the end of which the incumbent Justice's existing term will expire.  O.C.G.A. § 21-2-9(b); O.C.G.A. § 21-2-138;  Barrow, 842 S.E.2d at 892-93.

However, not all Justices *initially* take office by election for a six-year term.  Barrow, 842 S.E.2d at 893.  Under Paragraph III of the Constitution's judicial selection section, when a vacancy arises, such "[v]acancies shall be filled by appointment of the Governor except as otherwise provided by law in the magistrate, probate, and juvenile courts."  Ga. Const. Art. VI, Sec. VII, Par. III.[5]  Paragraph IV then specifies the term of office of a Justice who is appointed to fill a vacancy: "**Period of service of appointees.**  An appointee to an elective office shall serve until a successor is duly selected and qualified and until January 1 of the year following the next general election which is more than six months after such person's appointment."  Ga. Const. Art. VI, Sec. VII, Par. IV (emphasis in original).

**IV.  PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

[5]Under Georgia law, a vacancy may occur: (1) by the death of the incumbent; (2) by resignation, when accepted; (3) by decision of a competent tribunal declaring the office vacant; (4) by incapacity; (5) by the incumbent ceasing to be a resident of the State, or of the county, circuit, or district for which he was elected; (6) by failing to obtain commission or give bond; or (7) by abandoning the office and ceasing to perform its duties.  O.C.G.A. § 45-5-1(a)(1)-(7).  The Georgia Supreme Court has also held that the term "vacancy" as used in Paragraph III meas "a public office without an incumbent."  Clark v. Deal, 298 Ga. 893, 896 (2016); see also Barrow, 842 S.E.2d at 893.

9

On April 24, 2020, Plaintiffs filed a Motion for Preliminary Injunction, asking the Court to order Secretary Raffensperger to conduct the nonpartisan election previously set and noticed for the position of Justice of the Supreme Court of Georgia in the seat currently occupied by Justice Blackwell. A plaintiff seeking a preliminary injunction must demonstrate to the Court that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm; (3) the balance of equities weighs in his favor; and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001); Zardui-Quintana v. Richard, 768 F.2d 1213, 1216 (11th Cir. 1985). A preliminary injunction is an extraordinary and drastic remedy that should not be granted "unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." United States v. Jefferson Cty., 720 F.2d 1511, 1519 (11th Cir. 1983) (citing Canal Auth. v. Callaway, 489 F.2d 567, 573 (5th Cir. 1975)); see also Munaf v. Geren, 553 U.S. 675, 689–90 (2008). The plaintiff carries the burden of persuasion in all of the four requirements at all times. Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1231 (11th Cir. 2005); Jefferson County, 720 F.2d at 1519; Callaway, 489 F.2d at 573.

A.   **Count I**

In Count I of their complaint, Plaintiffs allege that Secretary Raffensperger violated their federal constitutional rights by cancelling an election in violation of state law. Plaintiffs rely on Duncan v. Poythress, 657 F.2d 691 (5th Cir.

1981) for the proposition that "rare, but serious violations of state election laws" may "operate so unfairly as to constitute a denial of . . . due process[.]" Duncan, 657 F.2d at 699 (internal quotation marks and citation omitted). Like this case, Duncan addressed the resignation of a former Associate Justice of the Georgia Supreme Court, Justice Jesse G. Bowles. Id. at 693. The events from Duncan are as follows. On November 4, 1980, Justice Bowles was reelected to the Georgia Supreme Court for a six-year term to begin on January 1, 1981. Id. However, on November 20, 1980, he wrote a letter of resignation to then-Governor George D. Busbee, stating that his resignation would be effective on December 31, 1980. Id. The governor accepted Justice Bowles' resignation by letter dated November 21, 1980. Id.

Despite tendering his resignation, Justice Bowles took the oath of office for the new term of office on December 15, 1980. Id. On January 5, 1981, the day Justice Bowles was supposed to start his new term, Justice Bowles sent a second letter of resignation to Governor Busbee. Id. Governor Busbee accepted the resignation that same day. Id. Three days later, on January 8, 1981, Governor Busbee swore in Hardy Gregory, Jr. as Justice Bowles' replacement on the Georgia Supreme Court. Id.

A group of registered voters filed suit under § 1983, claiming the appointment of a new Georgia Supreme Court Justice violated Georgia's special election statute, and therefore their constitutional right to vote. Id. at 692-93. The plaintiffs specifically argued that Governor Busbee's actions violated Ga. Code s 34-1514 (now O.C.G.A. 21-2-504), which provides that

11

"whenever any person elected to public office shall . . . withdraw prior to taking office," the appropriate state officials shall thereupon "call a special . . . election to fill such position." Ga. Code s 34-1514; see also Duncan, 657 F.2d at 693. By failing to hold a special election--the voters argued--the states' officials deprived them of their constitutional right to vote.

One of several issues before the United States Court of Appeals for the Fifth Circuit was "whether the due process clause of the fourteenth amendment offers protection against those rare, but serious, violations of state election laws that undermine the basic fairness and integrity of the democratic system." Duncan, 657 F.2d at 699. The court ultimately agreed with the voters, holding that the failure to hold a special election in contravention of state law constituted a violation of the Due Process Clause of the United States Constitution. The court stated that

> [it could] imagine no claim more deserving of constitutional protection than the allegation that state officials have purposefully abrogated the right to vote, a right that is fundamental to our society and preservative of all individual rights. Just as the equal protection clause of the fourteenth amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the fourteenth amendment forbids state officials from unlawfully eliminating that fundamental right. The United States Constitution protects against complete deprivation as well as invidious discrimination. It is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law so that they may fill the seats of government through the power of appointment. [The court] therefore [held] that such action violates the due process guarantees of the fourteenth amendment.

Id. at 704.

Plaintiffs argue that like the state officials in Duncan, Secretary Raffensperger disenfranchised voters in violation of state law so that seats of government could be filled through executive appointment. Specifically, Plaintiffs argue that because there is no physical vacancy, Governor Kemp's appointment power has not yet arisen and Secretary Raffensperger was therefore not authorized to cancel the election.

However, as previously discussed, the Georgia Supreme Court already found that Secretary Raffensperger did not violate state election law. When Justice Blackwell unequivocally tendered his resignation, and Governor Kemp unequivocally accepted that resignation, Justice Blackwell's resignation became inevitable and any election for his seat became legally nugatory. Because Secretary Raffensperger has no obligation to hold a legally meaningless election, he cannot be compelled to do so.

Secretary Raffensperger likewise did not violate the Georgia Constitution. The Georgia Constitution provides for an election system whereby Justices are both appointed and elected. It does not provide that an election is the exclusive means by which Justices initially take office. Rather, the two methods work in tandem; Justices are generally appointed into office and voters have the right thereafter to vote to reelect the appointee or vote for an opponent. Because Secretary Raffensperger did not violate state election law--statutory or constitutional--Plaintiffs' Duncan claim is unlikely to succeed on the merits.

**B.  Count II**

In the second count of their complaint, Plaintiffs argue that if Georgia law allowed Secretary Raffensperger to cancel the

election, Georgia law and Secretary Raffensperger's actions thereunder violated the United States Constitution. Specifically, Plaintiffs argue that the state's hybrid election-appointment system for Judicial selection is unconstitutional under the Fourteenth Amendment Due Process Clause.

When considering a challenge to state election law, the Court

> must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

Burdick v. Takushi, 504 U.S. 428, 434 (1992) (internal quotation marks and citation omitted).

Under this standard, the Court must engage in a two-step inquiry. First, it examines "the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." Id.; see also Anderson v. Celebrezze, 460 U.S. 780, 789 (1983); Duke v. Cleland, 954 F.2d 1526, 1529 (11th Cir. 1992) ("[T]o evaluate the constitutionality of a state election law, it is necessary to identify whether the challenged law burdens rights protected by the First and Fourteenth Amendment."). Where rights are subject to severe restrictions, strict scrutiny applies and the restriction must be narrowly tailored to advance a state interest of compelling importance. Burdick, 504 U.S. at 434; Norman v. Reed, 502 U.S. 279, 288-89 (1992). However, where a state election law imposes only "reasonable, nondiscriminatory

14

restrictions" on the First and Fourteenth Amendment rights of voters, rational basis applies. Burdick, 504 U.S. at 434.

Second, the Court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Anderson, 460 U.S. at 789. The Court must consider "the legitimacy and strength of each of those interests" as well as "the extent to which those interests make it necessary to burden the plaintiff's rights." Id.; see also Green Party of Ga. v. Kemp, 106 F. Supp. 3d 1314, 1321 (N.D. Ga. 2015). "No bright line separates permissible election-related regulation from unconstitutional infringement[.]" Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359 (1997); Storer v. Brown, 415 U.S. 724, 730 (1974) ("[N]o litmus-paper test . . . separat[es] those restrictions that are valid from those that are invidious[.] . . . The rule is not self-executing and is no substitute for the hard judgments that must be made.").

Secretary Raffensperger first argues that Plaintiffs have no federally protected right to vote for a position filled by appointment. Therefore, according to Secretary Raffensperger, Burdick has no application to this case.

It is indisputable that "voting is of the most fundamental significance under our constitutional structure." Ill. Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979); see also Burdick, 504 U.S. at 433. As the Supreme Court has stated, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heard of representative government." Reynolds v. Sims, 377 U.S. 533, 555 (1964).

Accordingly, the Supreme Court has routinely referred to the right to vote as "fundamental." Kramer v. Union Free Sch. Dist. No. 15, 395 U.S. 621, 626 (1969); Harper v. Va. State Bd. of Elections, 383 U.S. 663, 667 (1966); Reynolds, 377 U.S. at 555; Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886); see also Jones v. Governor of Fla., 950 F.3d 795, 808 (11th Cir. 2020); Wexler v. Anderson, 452 F.3d 1226, 1232 (11th Cir. 2006). Therefore, the Constitution "[u]ndeniably . . . protects the right of all qualified citizens to vote, in state as well as in federal elections." Reynolds, 377 U.S. at 554; Cook v. Randolph Cty., Ga., 573 F.3d 1143, 1152 (11th Cir. 2009) ("The Constitution certainly protects the right to vote.").

It does not follow, however, that the right to vote and the right to associate for political purposes are absolute. Burdick, 504 U.S. at 433; Munro v. Socials Workers Party, 479 U.S. 189, 193 (1986). Rather, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections[.]" Burdick, 504 U.S. at 433. Therefore, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." Storer, 415 U.S. at 730; see also Timmons, 520 U.S. at 358 ("On the other hand, it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.").

Although the right to vote in federal elections is conferred by the United States Constitution, see U.S. Const. Art. I, Sec.

II,[6] "the right to vote in state elections is nowhere expressly mentioned." Harper, 383 U.S. at 665. In fact, the Supreme Court has affirmed a state's ability to have its legislature choose its governor when no candidate received a majority of the popular votes. Fortson v. Morris, 385 U.S. 231 (1966). The Court has also ruled that where a county school board is an administrative body, and not a legislative one, its members need not be elected. Sailors v. Bd. of Educ. of Kent Cty., 387 U.S. 105, 110 (1967).[7] The Court in Kramer even indicated it would be constitutional to have an elected city council choose a mayor who would have broad administrative powers. Kramer, 395 U.S. at 629. It is therefore unclear when, if at all, the Constitution confers a right to vote in state elections such that the right would be violated if state or local government chose to eliminate elections for particular offices.

However, the Supreme Court has repeatedly declared that "once the [right to vote] is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." Harper, 383 U.S. at 665

_____

[6]See United States v. Classic, 313 U.S. 299, 314-15 (1941).

[7]There, the Supreme Court stated:

Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation. At least as respects nonlegislative officers, a State can appoint local officials or elect them or combine the elective and appointive systems as was done here.

Sailors, 387 U.S. at 110-11.

17

(finding poll taxes unconstitutional as a denial of equal protection and impermissible discrimination); see also Kramer, 395 U.S. at 629 (declaring unconstitutional a state law restricting voting in school district elections to those who owned taxable real property); Carrington v. Rash, 380 U.S. 89, 96-97 (1965) (invalidating provision of state constitution that denied voting to members of the armed forces who moved into the state for service, regardless of how long they had lived in the area).  And

> [j]ust as the equal protection clause of the fourteenth amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the fourteenth amendment forbids state officials from unlawfully eliminating that fundamental right.  The United States Constitution protects against complete deprivation as well as invidious discrimination.

Duncan, 657 F.2d at 704; see also Cook, 573 F.3d at 1152; Martin v. Kemp, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018).  Therefore, once a state grants the right to vote, the state must administer its voting regime in accordance with the Constitution.

Plaintiffs are correct that the Georgia Constitution guarantees qualified voters the right to vote for Supreme Court Justices.  Article II, Section I, Paragraph II states that "[e]very person who is a citizen of the United States and a resident of Georgia as defined by law, who is at least 18 years of age and not disenfranchised as provided by law shall be entitled to vote at any election by the people." Ga. Const. Art. II, Sec. I, Par. II; see also Perdue, 288 Ga. at 725 (noting the right to vote is guaranteed by the Georgia Constitution). Article VI, Section VII, Paragraph I(a) thereafter provides for judicial elections, stating that "[a]ll Justices of the Supreme

18

Court [of Georgia] . . . shall be elected on a nonpartisan basis for a term of six years." Ga. Const. Art. VI, Sec. VII, Par. I(a).

However, the Constitution likewise confers on the Governor an appointment power in the event of a vacancy. Ga. Const. Art. VI, Sec. VII, Par. III. As previously explained, the Constitutional provisions requiring judicial elections and those authorizing gubernatorial appointment work in tandem. Barrow, 842 S.E.2d at 894. Justices are generally appointed into office, and, after the Justice has had an opportunity to demonstrate his or her merit, qualified voters have the right to either reelect the Justice or vote for his or her opponent. It does not follow, however, that qualified voters have the right to vote Justices *into* office. Under the Georgia Constitution, neither mechanism is the exclusive means by which Justices take the bench and neither is constitutionally inferior than the other.

Despite Plaintiffs' arguments to the contrary, Georgia's hybrid appointment-election system

> was not intended to, nor does it in fact, disenfranchise voters. It is not in conflict with the mandate in [Paragraph I] that superior court and state court judges [and appellate judges] are to be elected on a nonpartisan basis for a four-year [or six-year] term. As its drafters envisioned, the six month provision gives the voters the right to select the holders of elective office, yet affords the appointee a sufficient opportunity to demonstrate the merit, or lack thereof, of the appointee's service.

Palmour, 278 Ga. at 220-21; see also Barrow, 842 S.E.2d at 896. Because there is no constitutionally protected right to vote for a position that the state constitution fills by both appointment and election, the Court agrees with Secretary Raffensperger that

19

Georgia's hybrid election-appointment system does not trigger constitutional scrutiny under Burdick.

Even if Plaintiffs could establish that they have the right to vote for Justice Blackwell's replacement, Plaintiffs still have not established that any burden on that right is violative of the Federal Constitution. Under the Burdick test, the Court must determine the burden Georgia's appointment provisions place on Plaintiffs' alleged right to vote in order to identify what level of scrutiny to apply. See Burdick, 504 U.S. at 434 ("[T]he rigorousness of our inquiry into the propriety of state election law depends on the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."). When voting rights are subjected to severe restrictions, the Court applies strict scrutiny and the regulation must be narrowly drawn to advance a compelling state interest. Id. When rights are subjected to only "reasonable, nondiscriminatory restrictions," the Court applies rational basis. Id.

The state's appointment system falls under the latter category; it only delays Plaintiffs' right to vote until the next general election and generally "serves the legitimate purpose of ensuring that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election." Rodriguez v. Popular Democratic Party, 457 U.S. 1 (1982). To be sure, Georgia's choice to fill judicial vacancies by appointment rather than by special election inevitably has some effect on the right of its citizens to elect members of the judiciary. See id. However, as the Supreme Court stated in Rodriguez, "the effect is minimal, and . . . it does not fall

20

disproportionately on any discrete group of voters, candidates, or political parties." Rodriguez, 457 U.S. at 12.

Applying rational basis scrutiny, Secretary Raffensperger argues that Georgia's appointment system, provided for in Articles III and IV, serves three strong interests: (1) promptly filing vacancies; (2) giving voters the opportunity to judge the appointees' performance before deciding whether or not to replace them in a non-partisan election; and (3) allowing the state to run its highest ranking judicial officers in a non-partisan general election so as to separate the election of judges from the election of political offices.   The Court finds these interests sufficient to justify any burden the state's appointment system has on Plaintiffs' right to vote for Supreme Court Justice--if such a right existed.  See Rodriguez, 457 U.S. at 12 (finding "interim appointment system plainly serves the legitimate purpose of ensuring that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election" and that "[t]he Constitution does not preclude this practical and widely accepted means of addressing an infrequent problem"); Valenti v. Rockefeller, 393 U.S. 405 (1969) (sustaining the authority of the Governor of New York to fill a vacancy in the United States Senate by appointment, pending the next regularly scheduled election);[8] see also Tedards

---

[8]The Court notes that Valenti involved an interpretation of the Seventeenth Amendment, which explicitly outlines the procedures for filling vacancies in the United States Senate. However, the Rodriguez Court nonetheless relied on Valenti, noting "the fact that the Seventeenth Amendment permits a state, if it chooses, to forgo a special election in favor of a temporary appointment to the United States Senate suggests that a

v. Ducey, 951 F.3d 1041, 1068 (9th Cir. 2020) (finding state's interests in avoiding the cost of a special election, maximizing voter turnout, and avoiding the possibility of voter confusion justified any restriction on the right to vote); Lynch v. Ill. State Bd. of Elections, 682 F.2d 93, 97 (7th Cir. 1982) ("As the Court in Rodriguez recognized, states have a legitimate interest in ensuring that governmental processes are not disrupted by vacancies and have wide latitude in devising a method to fill those vacancies promptly.").

Because Plaintiffs have failed to plausibly allege that Georgia's appointment system for judicial selection is not justified by important state interests, the Court finds that Plaintiffs have not met their burden of showing they would be likely to succeed on the merits of Count II of their complaint. The Court therefore DENIES Plaintiffs' Motion for Preliminary Injunction [Doc. 7].

## IV. DEFENDANT'S MOTION TO DISMISS

On June 1, 2020, Secretary Raffensperger filed a Motion to Dismiss [Doc. 20]. Secretary Raffensperger first argues that Count I of Plaintiff's complaint should be dismissed in light of the Georgia Supreme Court's decision in Barrow v. Raffensperger. Barrow, 842 S.E.2d at 907. For the reasons provided above, the Court agrees. Count I of Plaintiff's complaint is hereby DISMISSED.

---

state is not constitutionally prohibited from exercising similar latitude with regard to vacancies in its own legislature." Rodriguez, 451 U.S. at 11.

With respect to Count II, Secretary Raffensperger renews his argument that the Court lacks jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Secretary Raffensperger argues that Plaintiffs complain only of a generalized grievance and have therefore not satisfied Article III's injury-in-fact requirement. However, for the reasons stated in the Court's May 18, 2020 order [Doc. 15], the Court finds that Plaintiffs' alleged injury-- though shared by all Georgia voters--is sufficiently concrete and particularized to confer standing.

Secretary Raffensperger next argues that Count II should be dismissed for failure to state a claim under Rule 12(b)(6).  For the reasons provided above, the Court agrees with Secretary Raffensperger that Count II of Plaintiff's complaint does not state a claim.  First, Plaintiffs do not have a right to vote Georgia Supreme Court Justices *into* office under the Georgia Constitution.  Rather, Justices are generally appointed into office by the Governor, and, after the Justice has had an opportunity to demonstrate his or her merit, qualified voters have the right to either reelect the Justice or vote for his or her opponent.  Even if Plaintiffs did have such a right, there is still no constitutional violation under the Anderson-Burdick analysis because the state's appointment system is justified by legitimate state interests.  Accordingly, the Court DISMISSES Count II of Plaintiff's complaint.  The Court therefore GRANTS Defendant's Motion to Dismiss [Doc. 20].

V.   **CONCLUSION**

The Georgia Supreme Court's recent ruling in Barrow v. Raffensperger is determinative of Count I of Plaintiffs'

complaint.   Because Plaintiffs have not shown that Secretary Raffensperger violated state election law, Plaintiffs' claim under Duncan v. Poythress fails.   With respect to Count II, the Court finds that Plaintiffs do not have a federally protected right to vote Justices of the Georgia Supreme Court into office. Rather, under Georgia's hybrid appointment-election system, Justices of the Georgia Supreme Court are generally appointed by the Governor, after which qualified voters have the right to vote for the Justice's reelection (or for his or her opponent).   Even if Plaintiffs had a federally protected right to elect Justices of the Georgia Supreme Court into office initially, Plaintiffs have failed to establish that Georgia's appointment system is not justified by important state interests.   For these reasons, the Court DENIES Plaintiffs' Motion for Preliminary Injunction [Doc. 7] and GRANTS Defendant's Motion to Dismiss [Doc. 20].   The clerk is hereby DIRECTED to enter judgment for Defendant.   Costs to be assessed against Plaintiffs.


        SO ORDERED, this __15__ day of July, 2020.


                                 _____
                                 ORINDA D. EVANS
                                 UNITED STATES DISTRICT JUDGE